UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA                          :
                                                  :
            - v -                                 :        **24 Cr. 418 (MMG)**
                                                  :
SHYMELL EPHRON,                                   :
                                                  :
            Defendant.                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


### DEFENDANT SHYMELL EPHRON'S MOTION
### TO EXCLUDE THE GOVERNMENT'S PROPOSED EXPERT TESTIMONY

HANNAH MCCREA
AMY GALLICCHIO
MICHAEL ARTHUS
Federal Defenders of New York, Inc.
Attorney for Defendant
52 Duane Street, 10th Floor
New York, New York 10007
(212) 417-8700

TO:     DANIELLE SASSOON
        Acting United States Attorney
        Southern District of New York
        26 Federal Plaza
        New York, New York 10278
        Attn:  Ryan Allison
               Michael Herman
               Lisa Daniels

<u>**TABLE OF CONTENTS**</u>

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... iii

I.    Introduction .............................................................................................................. 1

II.    Legal Standard .......................................................................................................... 2

III.    The Court should exclude the testimony of Dr. Lisa Rocchio. ................. 5

   A.    Dr. Rocchio's proposed testimony is not based on scientifically reliable methods. ................................................................................................... 6

   B.    Dr. Rocchio's proposed opinions are inadmissible. ................................ 12

      *1.    Dr. Rocchio's opinions about "sexual abuse and responses" impermissibly relate to the ultimate issue of Mr. Ephron's intent, go beyond Dr. Rocchio's qualifications, are within the ken of the average juror, and would inject inadmissible and prejudicial hearsay into the trial.* .............................................................................................................. 12

      *2.    Dr. Rocchio's opinions on childhood sexual abuse and "grooming" are wholly inadmissible.* ......................................................................... 14

      *3.    Dr. Rocchio should not be permitted to testify about "coercive control."* ......................................................................................................... 21

      *4.    Dr. Rocchio's opinions on the experiences of "victims of sex trafficking" are entirely irrelevant.* ..................................................... 25

      *5.    Dr. Rocchio's proposed testimony on coping strategies is so broad as to be unhelpful.* ......................................................................................... 26

      *6.    Dr. Rocchio's delayed disclosure testimony is both irrelevant and impermissible bolstering.* ....................................................................... 27

      *7.    Dr. Rocchio is not qualified to opine on memory, and her opinions are blatant bolstering of the complainants' credibility.* ...................... 29

   C.    If Dr. Rocchio intends to convey hearsay to the jury, the government should be directed to identify any such statements before trial so that the Court can conduct a Rule 403 balancing test. ...................... 31

IV.    The Court should exclude the testimony of Alfred Hernandez. ............. 33

   A.    Hernandez's proposed testimony is generally inadmissible. ............... 33

   B.    Hernandez's specific proposed opinions are largely inadmissible. .. 37

      *1.    Hernandez's opinions on slang and coded language are inadmissible.* ................................................................................................ 38

      *2.    Hernandez's testimony about the "tools of the trade" used to produce and distribute narcotics, and about Mexican drug cartels, are irrelevant and unfairly prejudicial.* ...................................................... 38

      *3.    Hernandez is not qualified to opine on the differences between MDMA and methamphetamine.* ............................................................. 42

**4.    *Hernandez' testimony on the appearance and pricing of narcotics is within the ken of the average juror and mirrors the government's trial evidence.*** ................................................................................................42

**5.    *Hernandez's opinions on the use of "trap" phones are within the ken of the average juror.*** ..........................................................................43

**6.    *Hernandez's opinions on the use of minors to sell drugs is unreliable, inadmissible on the issue of* mens rea*, and improper propensity evidence.*** ...........................................................................44

**7.    *Hernandez is not qualified to testify about drug dealers' use of drugs, specifically methamphetamine, to entice and coerce minors into sex.*** ...................................................................................................44

**V.    Conclusion.** .............................................................................................46

## TABLE OF AUTHORITIES

**Cases**

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ............... passim

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)................................. 2, 7, 23

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005)................................ 5, 13, 24

*United States v. Alvin Eusebio*, 21-Cr-522 (GHW)  (S.D.N.Y. Dec. 4, 2024) ........ 2, 26

*United States v. Burns*, 2009 WL 3617448 (N.D. Ill. 2009) (unreported)................. 13

*United States v. Castillo*, 924 F.2d 1227 (2d Cir. 1991) ........................... 25, 29, 31, 34

*United States v. Cruz*, 363 F.3d 187 (2d Cir. 2004)............................................ 29, 35

*United States v. Cruz*, 981 F.2d 659 (2d Cir. 1992)........................................... passim

*United States v. Dugue*, 763 Fed.Appx. 93 (2d Cir. 2019).................................. 13, 24

*United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003) ........................... 4, 24, 27, 28

*United States v. Gonyer*, 2012 WL 3043020 (D. Maine 2012) (unreported) ...... passim

*United States v. Kaufman*, 2021 WL 4084523 (S.D.N.Y. 2021) (unreported) ............ 6

*United States v. Lumpkin*, 192 F.3d 280 (2d Cir. 1999)........................................ 4, 24

*United States v. Maxwell*, 2021 WL 5283951 (S.D.N.Y. 2021) (unreported)..... passim

*United States v. Maxwell*, 2022 WL 1294433 (S.D.N.Y. 2022) (unreported)............. 14

*United States v. Maxwell*, 20-Cr-330 (AJN) (S.D.N.Y. Nov. 10, 2021) ............ 6, 13, 23

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008)............................ 19, 24, 27, 28

*United States v. Mrabet*, 703 F.Supp.3d 442 (S.D.N.Y. 2023) .................................... 2

*United States v. Mulder*, 273 F.3d 91 (2d Cir. 2001)........................................... 18, 27

*United States v. Ojeikere*, 2005 WL 425492 (S.D.N.Y. Feb. 18, 2005) ...................... 29

*United States v. Raniere*, 2019 WL 2212639 (E.D.N.Y. 2019) (unreported)............... 8

*United States v. Ray*, 2022 WL 101911 (S.D.N.Y. 2022) ..................................... 17, 25

*United States v. Raymond*, 700 F.Supp.2d 142 (D. Maine 2010)...................... passim

*United States v. Rijo*, 508 Fed.Appx. 41 (2d Cir. 2013)............................ 13, 26, 29, 33

*United States v. Schneider*, 2010 WL 3734055 (E.D. Pa. 2010) (unreported) ... passim

*United States v. Scop*, 846 F.2d 135 (2d Cir. 1988) ............................................... 3, 18

*United States v. Tapia–Ortiz,* 23 F.3d 738 (2d Cir.1994)......................................... 25

*United States v. Taylor*, 2025 WL 243391 (D. Conn. Jan. 20, 2025) ........................ 29

*United States v. Torres*, 2021 WL 1947503 (S.D.N.Y. 2021) (unreported) ............... 17

*United States v. Waqar*, 997 F.3d 481 (2d Cir. 2021)............................................ 9, 10

*United States v. Yevakpor*, 271 Fed.Appx. 19 (2d Cir. 2008) .................................... 30

**Rules**

Fed. R. Evid. 401......................................................................... 16, 20, 30, 32

Fed. R. Evid. 403......................................................................................... passim

Fed. R. Evid. 404......................................................................................... passim

Fed. R. Evid. 608....................................................................................................... 24

Fed. R. Evid. 702......................................................................................... passim

Fed. R. Evid. 703....................................................................................................... 24

Fed. R. Evid. 704......................................................................................... passim

## I.    **Introduction**

In May 2024, two troubled teenage complainants ran away from their homes in Westchester and spent several days in New York City.  During their stay, they spent time with defendant Shymell Ephron, and left him a note thanking him for having taken them in.  After the FBI found the complainants and returned them to their homes, the complainants suddenly claimed that, during their time in the city, Mr. Ephron had had sex with them, given them drugs and a cell phone, and told them to sell drugs for him.  Their stories were frequently inconsistent, vague, and internally contradictory.

In a superseding indictment, the government charged Mr. Ephron with two counts of coercion and enticement of a minor, one count of conspiracy to distribute controlled substances, two counts of distribution of a controlled substance using a minor, and two counts of distribution of a controlled substance to a minor.  On December 30, 2024, the government served notice under Fed. R. Crim. P. 16(a)(1)(G) of intent to call at least eight experts during its case-in-chief, including Dr. Lisa Rocchio and Assistant Inspector General Alfred Hernandez. The government plans to offer Dr. Rocchio, a psychologist, to testify about topics related to child sexual abuse including "grooming," "coercive control," "delayed disclosure," and "memory."  Ex. A at 7-34.  Hernandez, meanwhile, plans to testify about topics related to drug trafficking including slang and coded language, "tools of the trade," the differences between drugs, drug appearance

and pricing, the use of cellular phones, and drug dealers' purported interactions with minors including coercion and enticement. *Id.* at 35-41.

On January 15, 2025, the defense requested that the government provide additional information about the bases for Dr. Rocchio's opinions, and informed the government of its view that its expert notice with respect to Hernandez was insufficient under Fed. R. Crim. P. 16(a)(1)(G)(iii).[1] On January 27, 2025, the government responded to the defense's request with a supplemental disclosure for Hernandez, and provided no further useful information about the bases for Dr. Rocchio's opinions. Ex. B.

The testimony of both Dr. Rocchio and Assistant Inspector General Hernandez is inadmissible. Their testimony is not based on scientifically valid methods, is largely irrelevant to the charges against Mr. Ephron, and would violate myriad rules of evidence as well as the Due Process and Confrontation Clauses of the Constitution. For the reasons stated below, the Court should preclude their testimony.

## II.    <u>Legal Standard</u>

An expert's proposed opinions are inadmissible unless (1) the expert's scientific, technical, or other specialized knowledge will help the jury to understand

---

[1] The government has a history of providing insufficient notice regarding Hernandez, its oft-used "drug expert." *See, e.g., United States v. Mrabet*, 703 F.Supp.3d 442 (S.D.N.Y. 2023); *United States v. Alvin Eusebio*, 21-Cr-522 (GHW), ECF No. 532 (S.D.N.Y. Dec. 4, 2024) (government responded to defendant's motion to exclude Hernandez's testimony due to insufficient notice by providing supplemental disclosure with substantially more information); *United States v. Jonathan Torres*, 23-cr-395 (JGK), ECF No. 70 (S.D.N.Y. Mar. 28, 2024) (same).

the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert's opinion reflects a reliable application of those principles and methods to the facts of the case. Fed. R. Evid. 702. The Court has a "gatekeeping" obligation by which it must "ensure the reliability and relevancy of expert testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

In satisfying its gatekeeping function, the Court must make a "preliminary assessment of whether the reasoning or methodology underlying the [expert's] testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993). The first part of the *Daubert* test – determining scientific validity – is meant to ensure that the expert's opinions are "ground[ed] in the methods and procedures of science" rather than just the expert's "subjective belief or unsupported speculation." *Id.* at 590. The Supreme Court has counseled district courts to apply a non-exhaustive list of considerations to determine the reliability of an expert's opinions, including: whether the expert's methodology and conclusions can be tested and are falsifiable; whether they have been subjected to peer review and publication; whether there is a known or potential error rate; and whether the expert's methodology has achieved widespread acceptance within the scientific community. *Id.* at 593-94. Courts also typically consider a number of other factors to evaluate reliability, including whether the expert has developed her opinions for the purposes of testifying; whether she has unjustifiably extrapolated

from accepted premises to unfounded conclusions; whether she has adequately accounted for alternative explanations; whether she is being as careful in her paid testimony as she would be in typical field work; and whether the expert's field of study has been known to reach reliable results. Fed. R. Evid. 702, Advisory Committee Notes to 2000 Amendments.

If the expert's testimony is reliable, the second part of the *Daubert* test requires the Court to evaluate "fit" – whether the expert's proffered opinion is relevant. *Daubert*, 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (citation and internal quotations omitted). Even if proposed expert testimony has been admitted in previous cases, the Court must determine whether it is relevant to the instant case, since "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id.*

Expert testimony that satisfies the *Daubert* test and Rule 702 may still be inadmissible under the remainder of the Federal Rules of Evidence. For instance, an expert in a criminal case is forbidden to opine on the ultimate issue of whether a defendant had the necessary *mens rea*. Fed. R. Evid. 704. Nor can an expert's opinion invade the province of the jury to determine legal issues, *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988), or usurp the jury's role in determining a witness's credibility. *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999). An expert may not testify about subjects within the ken of the average juror, provide testimony that mirrors the testimony of the government's witnesses, or act as a summary

4

witness of the government's evidence. *United States v. Cruz*, 981 F.2d 659, 664 (2d Cir. 1992). And the government cannot utilize an expert as a means of backdooring in inadmissible hearsay, *United States v. Dukagjini*, 326 F.3d 45, 57-58 (2d Cir. 2003), or providing conclusions bearing on propensity. Fed. R. Evid. 404.

Finally, expert testimony, even if otherwise admissible, must nevertheless be excluded if its probative value is substantially outweighed by its prejudicial effect. Fed. R. Evid. 403. In carrying out the familiar Rule 403 balancing test, courts must be more discerning and "exercise[] more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (citations and internal quotations omitted). This more exacting Rule 403 test is critical in the expert context, since "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Id.* at 595. Given the difficulties of challenging expert testimony on cross-examination, the Second Circuit has "expressed discomfort about uncontrolled expert testimony that provides sweeping conclusions." *Dukagjini*, 326 F.3d at 53.

### III.   <u>The Court should exclude the testimony of Dr. Lisa Rocchio.</u>

The government has served notice that it intends to call Dr. Lisa Rocchio, a psychologist, to provide opinions on seven topics: (1) the general patterns of sexual abuse; (2) patterns specific to child sexual abuse, including "grooming"; (3) "coercive control strategies," which typically appear in intimate partner violence but which she claims has sometimes appeared in sexual abuse situations; (4) patterns frequently appearing in "sex trafficking"; (5) coping strategies of victims of childhood sexual abuse; (6) delayed disclosure; and (7) the reliability of the memories.

Dr. Rocchio's proposed testimony is inadmissible.  Her methodology – which is based principally on anecdotes learned during patient interviews or recounted in unspecified literature, requires crediting those anecdotes as truthful.  That anecdotal methodology has no known error rate, is unfalsifiable, and involves information learned only from purported victims, not alleged perpetrators.  Such flimsy and unscientific methodology cannot satisfy the reliability standards of *Daubert* and Rule 702.  Moreover, several of Dr. Rocchio's opinions, including about "grooming," "coercive control," and "delayed disclosure," are irrelevant in this case and relate to topics within the ken of the average juror.  And her opinions otherwise violate general principles of federal evidentiary law, including the prohibitions on hearsay, bolstering, propensity evidence, and testimony on the ultimate issue of a defendant's *mens rea.*  Admitting Dr. Rocchio's testimony would violate the rules of evidence and deny Mr. Ephron his due process rights to a fair trial, confrontation, and the effective assistance of counsel.  U.S. Const. amends. V, VI, XIV.

### A.  Dr. Rocchio's proposed testimony is not based on scientifically reliable methods.

According to the government's expert notice, Dr. Rocchio's opinions are based on "the totality of [her] relevant education, training, skills, knowledge, and professional experience, including her assessment and treatment of patients, her forensic assessments, her work and consultation with professional colleagues, continuing education, and review of relevant scientific literature in her field."  Ex. A.  In response to a request for further information about what specific literature Dr. Rocchio has consulted, which trainings she has attended, and which colleagues she

has conferred with, the government relied on Dr. Rocchio's *curriculum vitae*, adding vaguely that "[a]ll the specific colleagues Dr. Rocchio has consulted, the continuing education and professional trainings she has attended, and the literature she has reviewed over the course of her entire career would be too numerous to count or list here." Ex. B at 1-2.

The government's notice, therefore, amounts to nothing more than a listing of opinions that are "connected to existing data only by the *ipse dixit* of the expert." *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005). Dr. Rocchio's notice does not endeavor to identify the scientific literature specifically supporting her conclusions, or the trainings she has attended that have been focused on topics like "grooming" or "coercive control." Her *curriculum vitae* likewise contains no specific mention of the topics about which she intends to opine, such as "grooming," "coercive control," "memory," or "sex trafficking." Ex. A at 17-34. It is impossible to state based on the government's expert disclosure that Dr. Rocchio's opinions are based on scientifically reliable methods, since all the government will say is that Dr. Rocchio has read a lot, heard a lot, and has reached her opinions based on the "totality of her experience" – precisely the kind of *ipse dixit* logic *Nimely* condemned. The government's refusal to identify the specific literature on which Dr. Rocchio relies or specific relevant trainings she has attended, moreover, denies Mr. Ephron a "fair opportunity to test the merit of [Dr. Rocchio's] testimony through focused cross-examination" and renders its expert notice insufficient. *United States v. Kaufman*, 2021 WL 4084523, at *19 (S.D.N.Y. 2021) (unreported).

In any event, based on the limited information the government has disclosed about the basis for Dr. Rocchio's opinions, her methodology does not satisfy the *Daubert*/702 standard. When an expert relies "solely or primarily on experience, the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702, Advisory Committee Notes to the 2000 Amendments. Dr. Rocchio's opinions are based on information that has been learned through interviews with purported victims of sex crimes – in other words, anecdotal evidence. The methodology on which she relies and the literature she claims to have read includes no controlled studies and has no demonstrable error rate. Fed. R. Evid. 702, Advisory Committee Notes to 2023 Amendments (in forensic context in criminal cases, judges should inquire into known error rate as part of *Daubert* inquiry). As anecdotal evidence, it is unfalsifiable – in fact, Dr. Rocchio has indicated that in the clinical interview context "it is not [her] role to determine whether something is or is not true." *United States v. Maxwell*, 20-Cr-330 (AJN), ECF No. 467, at 40 (S.D.N.Y. Nov. 10, 2021). Even in the forensic context, in which she is tasked with verifying claims, Dr. Rocchio's experience is limited solely to knowledge of information gleaned from individuals who *report* sexual abuse; she cannot testify as to the experiences of sexual abuse victims writ large, since she has no knowledge of the patterns of behavior inherent to unreported sexual abuse. And her methodology involves interviews of purported victims only, and not perpetrators, leaving her in no position to testify about the patterns perpetrators use in order to "groom" or "coercively

control" victims.  *See Kumho Tire*, 526 U.S. at 151 (*Daubert* factors are relevant even as applied to experience-based testimony, and it may be appropriate to ask how often an "experience-based methodology has produced erroneous results").

District Courts have excluded expert testimony, particularly in the context of explaining the behaviors of sexual abuse perpetrators and victims, that suffers from similar flaws.  For instance, in *United States v. Raymond*, 700 F.Supp.2d 142, 149 (D. Maine 2010), the court excluded expert testimony on the "behavioral characteristics of child molesters and child victims" as the kind of "'subjective, conclusory approach' that cannot be 'reasonably assessed for reliability' under Rule 702."  As the Court noted at length:

> In his "grooming" article, Lanning repeatedly describes what *many* offenders or *some* victims are *more likely* or *less likely* to do or *tend* to do or *usually* do. For example, he writes, "Offenders who prefer younger child victims are more likely to first 'seduce' the victim's parents to gain their trust and obtain increased access to the potential victim." *Grooming* at 13. He also states that "[i]n my experience, many valid claims of child sexual molestation, especially those by compliant child victims, involve the delayed disclosures, inconsistencies, varying accounts, exaggerations, and lies often associated with false allegations.'" *Id.* at 30. Nowhere does Lanning cite an objective benchmark for these frequencies or comparisons. What is "more likely"? Fifty-one percent? How many is "many"? How few is "some"? What is the error rate for Lanning's behavioral generalizations? Can Lanning's opinions be tested or challenged in any objective sense? Nowhere do I see any discussion of false positives. How many cases has Lanning found where people who possess all the characteristics he describes nevertheless turn out to be innocent or where victims who behave as he describes turns out to be lying? Has he even looked for such examples? For all I can tell, that number may be more, fewer, or the same as, the thousands of cases he says that

he has investigated where a defendant turned out to be guilty or where a victim turned out to be telling the truth. And are these rules of exclusion, or only of inclusion? For example, Lanning describes what the "grooming or seduction process *usually* consists of." *Id.* at 13 (emphasis added). But what if a defendant fails to do one of the things that Lanning's child molester would *usually* do? Can the defendant then argue to the jury that he must therefore *not* have been grooming a child?

*Id.* at 148-49; *see United States v. Gonyer*, 2012 WL 3043020, at *2 (D. Maine 2012) (unreported) (excluding testimony on behaviors of child abuse perpetrators and victims, since expert's "experience-based opinions and his inability to cite an error rate for false positives make his testimony virtually impregnable for purposes of cross-examination"); *United States v. Schneider*, 2010 WL 3734055, at *3-4 (E.D. Pa. 2010) (unreported) (excluding "grooming" and delayed disclosure testimony because expert evaluated only purported victims and not perpetrators, methodology of clinical interviews had no known error rate or method to determine if report was a lie, and expert could not opine on behaviors of perpetrators or of victims in cases where no report was made); *see also United States v. Raniere*, 2019 WL 2212639, at *7-8 (E.D.N.Y. 2019) (unreported) (ordering *Daubert* hearing on grooming testimony that was based only on studies of purported victims, not perpetrators; government then withdrew expert notice).

Just like the expert testimony on the behaviors of sexual abuse victims and perpetrators excluded in *Raymond*, *Gonyer*, and *Schneider*, Dr. Rocchio's opinions are not based on reliable methodology and cannot satisfy the *Daubert* standard. Although most of Dr. Rocchio's proposed opinions were admitted following a *Daubert*

hearing in *United States v. Maxwell*, 2021 WL 5283951 (S.D.N.Y. 2021) (unreported), the court's non-binding opinion in that case was both incorrect and inapposite to the situation presented here. In *Maxwell*, for instance, the Court permitted Dr. Rocchio to testify based on her interviews of victims because she was testifying merely about the impact of behaviors on the minor victims and not on the perpetrator's state of mind. *Id.* at *3. Here, by contrast, like the expert in *Raymond*, Dr. Rocchio intends to testify about the behaviors of perpetrators, a topic about which she has no knowledge by virtue of never having met an alleged perpetrator. Indeed, the question the jury needs to resolve here is whether Mr. Ephron knowingly enticed or coerced the complainants, not whether they felt coerced, making Dr. Rocchio's testimony about the impact of Mr. Ephron's alleged behaviors on the complainants irrelevant. *See United States v. Waqar*, 997 F.3d 481, 485-86 (2d Cir. 2021). And the *Maxwell* Court's excusal of the lack of falsifiability or known error rate in Dr. Rocchio's methodology is simply incorrect: that one cannot ethically perform a non-qualitative or controlled study of child sexual abuse does not somehow transform the reliance on anecdotal evidence into a scientifically reliable method. *Maxwell*, 2021 WL 5283951, at *3.

Accordingly, since Dr. Rocchio's methodology is not reliable, her testimony cannot satisfy the *Daubert* test and must be excluded. At the very least, the Court should order a hearing regarding Dr. Rocchio's methodology, given the vagueness of her expert notice.

B.    **Dr. Rocchio's proposed opinions are inadmissible.**

Beyond the insurmountable flaws in her methodology, detailed above, each of Dr. Rocchio's opinions is inadmissible as either irrelevant or violating the Federal Rules of Evidence.

> 1.    *Dr. Rocchio's opinions about "sexual abuse and responses" impermissibly relate to the ultimate issue of Mr. Ephron's intent, go beyond Dr. Rocchio's qualifications, are within the ken of the average juror, and would inject inadmissible and prejudicial hearsay into the trial.*

The government intends to have Dr. Rocchio offer the jury definitions of several terms: traumatic stress, interpersonal violence, and sexual assault.  Dr. Rocchio will also testify that the "majority of sexual assaults are committed by someone known to the victim," and "perpetrators often exploit preexisting power differentials between themselves and their victims for the purpose of perpetuating sexual abuse and preventing disclosure."  Ex. A at 7-8.

Initially, Dr. Rocchio's opinions would violate Federal Rule of Evidence 704(b), which prohibits expert testimony about "whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or a defense," and makes clear that "[t]hose matters are for the trier of fact alone."  Mr. Ephron is charged with two counts of coercion and enticement of a minor, 18 U.S.C. § 2422(b), which requires the government to prove that he had the "specific intent to persuade, induce, or entice a minor to engage in unlawful sexual conduct."  *Waqar*, 997 F.3d at 487.  Dr. Rocchio plans to opine directly on this specific intent by telling the jury that, in her expert opinion, "perpetrators often exploit preexisting power

differentials" for the specific "purpose of perpetuating sexual abuse." Ex. A at 7-8. She will testify, moreover, that "interpersonal violence" refers to "dynamics related to coercion and emotional abuse or child abuse that may not necessarily involve violence as commonly understood." *Id.* In other words, Dr. Rocchio will inform the jury that perpetrators engage in behaviors specifically *intended* to induce or coerce sexual activity – the ultimate *mens rea* issue the jury must determine.

Making matters worse, this opinion is clearly beyond Dr. Rocchio's purported expertise. As noted, her methodology is rooted only in interviews of and literature about purported victims of sexual abuse, and not accused perpetrators. She is not qualified to testify about the state of mind of perpetrators. *See Maxwell*, 2021 WL 5283951, at * 4 (Dr. Rocchio's opinions admissible because testifying only about effect of behaviors on minor and not perpetrator's state of mind). Yet that is precisely what she seeks to do here, by offering an opinion of the reasons why perpetrators behave in certain ways. Her opinions therefore not only violate Rule 704 but go well beyond the extent of her expertise. *See Schneider*, 2010 WL 3734055, at *3 (expert whose experience is only with victims not qualified to testify about practices of perpetrators).

Nor is Dr. Rocchio's opinion beyond the ken of the average juror. Fed. R. Evid. 702(a) (expert may only testify about topics that will "help the trier of fact to understand the evidence or to determine a fact in issue"). It is common knowledge that sexual abuse is typically committed by a person known to the victim. *See Raymond*, 700 F.Supp.2d at 151 ("A jury in 2010 does not need expert testimony to help it understand that not every child abuser is 'a dirty old man in a wrinkled

raincoat' who snatches children off the street as they wait for the school bus"). Likewise, that individuals would exploit power differentials to commit sexual abuse is well within the common knowledge of a lay juror in this day and age, following the #Metoo movement and several high-profile convictions.   No expert testimony is needed to explain those concepts to a contemporary juror.

Accordingly, since Dr. Rocchio's opinions violate Rule 704(b), go beyond the scope of her expertise, and relate to topics within the ken of the average juror, they should be precluded.

### 2.    Dr. Rocchio's opinions on childhood sexual abuse and "grooming" are wholly inadmissible.

According to its expert notice, the government intends to have Dr. Rocchio opine at length about the concept of "grooming," which she defines as "the use of deliberate psychological manipulation, coercion, controlling tactics, threats, and intimidation," which are "commonly utilized by perpetrators for the purpose of sexually abusing children."  Ex. A at 8-10.  Dr. Rocchio will testify about the stages of "grooming," the tactics perpetrators "commonly" use, and the reasons perpetrators employ those tactics.   She will also testify about the "numerous deleterious psychological outcomes" that sexual abuse victims often suffer after the abuse has concluded.  *Id.*

Initially, Dr. Rocchio's testimony is irrelevant and cannot satisfy *Daubert*'s "fit" requirement.  *Daubert*, 509 U.S. at 591.  This is, quite simply, not a "grooming" case. As Dr. Rocchio intends to opine, "grooming" "involves a deceptive and manipulative process that involves the use of an escalating series of behaviors across time that are

14

designed to facilitate sexual abuse and prevent disclosure." Ex. A at 8. According to Dr. Rocchio, "grooming" proceeds in stages: selective and progressive isolation, the employment of behaviors designed to win the trust of a child and her family, a desensitization phase employing the use of physical touch, and a maintenance phase while sexual abuse "continues over time." *Id.*

Here, however, the complainants allege that Mr. Ephron had sex with them almost immediately after meeting them in Times Square. The counts charging coercion and enticement of a minor allege an entire time frame of five days. The complainant in count one told law enforcement that she and Mr. Ephron had sex the day they met, and that she "made the first move." The complainant in count two, meanwhile, accused Mr. Ephron's unindicted co-conspirator of having forcibly raped her within hours of their meeting, and alleged that Mr. Ephron forcibly raped her multiple times over the next few days.

As such, Dr. Rocchio's testimony on "grooming" does not fit the facts of Mr. Ephron's case. There has never been any allegation that Mr. Ephron utilized an "escalating series of behaviors across time," or that his actions proceeded in stages over an extended time period. Dr. Rocchio identifies no literature indicating that "grooming" can occur over a matter of mere hours or a single day. As a result, Dr. Rocchio's "grooming" testimony will not "help the trier of fact to understand the evidence." Fed. R. Evid. 702(a). It will, instead, introduce a confusing and controversial psychological theory into a trial whose facts bear no relation to it. *See*

*Daubert*, 509 U.S. at 592-93 (expert testimony only admissible if reasoning and methodology "properly can be applied to the facts in issue").

Even if "grooming" were an issue in this trial, however, Dr. Rocchio's opinion is inadmissible for myriad reasons. First, as multiple courts have held, "grooming" testimony does not satisfy *Daubert*'s reliability test since is a controversial topic with no clear definition, no known error rate, based entirely on anecdotal evidence provided only by purported victims and only in situations where a report is actually made, and has no mechanism for objective evaluation or falsifiability. *See Raymond*, 700 F.Supp.2d at 148-51; *Schneider*, 2010 WL 3734055, at *4-7; *see also Gonyer*, 2012 WL 3043020, at *2-4. Even courts that have admitted grooming testimony in cases vastly different than Mr. Ephron's have recognized its controversial nature. *See Maxwell*, 2021 WL 5283951, at *2-3 (recognizing that the Second Circuit has not yet approved of the use of "grooming" experts, acknowledging that experts continue to debate what "grooming" actually entails, and precluding part of Dr. Rocchio's proposed "grooming" testimony as unreliable); *see also Gonyer*, 2012 WL 3043020, at * 4 ("[E]ven those courts that have allowed this testimony have had qualms about its admissibility"). As one court noted, "grooming" has no clear definition, "radically simplifies" complex human behavior "into the neat dichotomy of victim and predator," and "foists a damning teleology on a series of actions each of which might have been motivated by a variety of ends or no ends at all." *United States v. Burns*, 2009 WL 3617448, at *5 (N.D. Ill. 2009) (unreported). And even Dr. Rocchio has acknowledged at a previous *Daubert* hearing that the scientific literature on which she supposedly

relies includes articles by experts who conclude that "there's a lack of consensus regarding what grooming is and talk about it not meeting the *Daubert* standard." *Maxwell*, 20-Cr-330 (AJN), ECF No. 467, at 134-42. As the court observed in rejecting grooming testimony in *Raymond*, introducing such opinions "invites a toxic mixture of purported expertise and common sense" that would deny a defendant a fair trial. 700 F.Supp.2d at 150. Or, put differently, it "runs the risk of creating a false sense of expert infallibility in an area of testimony that has not been subjected to scientific scrutiny." *Gonyer*, 2012 WL 3043020, at *3.

Second, Dr. Rocchio's "grooming" testimony would improperly bolster the credibility of the government's witnesses. The Second Circuit has "consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702." *Nimely*, 414 F.3d at 398; *see also United States v. Dugue*, 763 Fed.Appx. 93, 96 (2d Cir. 2019) (general testimony about the credibility of cooperators inadmissible, even when not related to specific cooperator in case). Likewise, expert testimony that essentially mirrors or summarizes the government's factual narrative is inadmissible, as it usurps the jury's role by "implicitly encourag[ing] the jury to draw the government's preferred inferences." *United States v. Rijo*, 508 Fed.Appx. 41, 45 (2d Cir. 2013) (summary order) (testimony regarding "typical" drug transaction that mirrors the government's factual narrative is inadmissible); *accord Cruz*, 981 F.2d at 664 (expert testimony cannot bolster credibility of government's witnesses by mirroring government's factual narrative).

Here, Dr. Rocchio intends to testify about the "typical" fact pattern surrounding childhood sexual abuse, including the selection of victims that are particularly vulnerable to abuse, the formation of bonds of attachment, the giving of gifts, and giving the child special attention. The inference Dr. Rocchio's testimony invites the jury to draw is that, since those things allegedly happened here, then the complainants must be credible because their experience follows a "pattern." In fact, this is precisely the argument the government has made in previous cases. *See United States v. Maxwell*, 2022 WL 1294433, at *5-6 (S.D.N.Y. 2022) (unreported) (applying Dr. Rocchio's expert testimony on "grooming," government repeatedly argued in summation that defendant's "conduct as to each victim followed a uniform 'playbook'"). As such, Dr. Rocchio's "grooming" testimony is inadmissible since it purports to "put the expert's stamp of approval on the government's theory." *Raymond*, 700 F.Supp.2d at 150.

Third, Dr. Rocchio's testimony would violate Federal Rule of Evidence 404's prohibition on the introduction of propensity evidence. Dr. Rocchio intends to testify about the tactics and behaviors that sexual abuse offenders "commonly" utilize to "coerce, control, and sexually victimize the child." Ex. A. Many of the behaviors Dr. Rocchio will testify to are not behavior the complainants claim happened in this case: there is, for instance, no allegation that Mr. Ephron tried to win over the complainants' family or friends, targeted the complainants based on particular vulnerabilities or sexual abuse history, or took the complainants "out to special places." As one court observed in precluding testimony about the common behaviors

of sexual abuse perpetrators by an expert who, like Dr. Rocchio, has never examined a sexual abuse perpetrator:

> Mr. Jenner's testimony runs the risk that the jury will use his opinions to draw improper conclusions about Mr. Gonyer's character in violation of Rule 404(a)(1). Fed.R.Evid. 404(a)(1) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait"). Here, the expert testimony is untethered to the facts in this case. For example, Mr. Jenner would say that sexual predators use compromising photographs and videotapes of the victims to blackmail them into silence, but there may be no evidence in this case of any such threats against the victim, thus allowing the jury to attribute such actions to Mr. Gonyer because "sexual predators like him" do such things.

*Gonyer*, 2012 WL 3043020, at *3.

Fourth, Dr. Rocchio's "grooming" testimony concerns matters that are well within the ken of the average juror. As the *Raymond* Court observed, the proposed "grooming" expert's opinions "are actually common sense observations that the government can simply argue in closing." 700 F. Supp.2d at 150. "[E]ven an 'untrained layman,' the ordinary jury member, is qualified to 'determine intelligently and to the best possible degree' whether a person has seduced a child, without enlightenment from" an expert. *Id.* at 151; *see also Schneider*, 2010 WL 3734055, at *7 ("[A] jury in 2010 does not need expert testimony to show that child sexual abusers can often be ostensibly responsible and well-meaning adults who occupy positions of trust in society"). Therefore, Dr. Rocchio's opinions cannot "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

Fifth, Dr. Rocchio's proposed testimony relates to the ultimate issue of Mr. Ephron's *mens rea*, the type of opinion that is specifically prohibited. Fed. R. Evid. 704(b). Dr. Rocchio wishes to opine that perpetrators commonly engage in "coercion" and "controlling tactics" for the "purpose of sexually abusing children." Ex. A. at 7-9. Her expert disclosure on "grooming" repeatedly refers to efforts by perpetrators to coerce victims. Since the question of whether Mr. Ephron intentionally engaged in coercive behavior is the ultimate question for the jury to resolve, Dr. Rocchio's opinion that sexual abuse perpetrators commonly engage in coercive tactics for the purpose of committing sexual abuse is precisely the kind of ultimate issue opinion that Rule 704(b) forbids. *See Gonyer*, 2012 WL 3043020, at *3 (grooming testimony would "skim the edges of Rule 704(b)" by "allow[ing] the jury to place Mr. Gonyer's relationship with the victim into the stages of predatory seduction," even where the government disavowed an intent to have the expert "testify directly about what Mr. Gonyer was thinking").

And sixth, even if otherwise admissible, Dr. Rocchio's "grooming" opinions would violate Rule 403. Given that Mr. Ephron's alleged behavior bears little if any resemblance to "grooming," Dr. Rocchio's opinion has at best a slight probative value. By contrast, it would have a substantial prejudicial effect: it would expose the jury to potentially graphic and disturbing details of unrelated behavior in unrelated cases, and would confuse the issues by introducing the concept of "grooming" into a case that does not fit its mold. As one court has observed, "to describe the attributes of a

sexual predator and to invite the jury to so label a defendant poses Rule 403 problems." *Gonyer*, 2012 WL 3043020, at *3.

And the problems go far beyond just Dr. Rocchio's testimony about the "common" behavior of sexual predators. Dr. Rocchio also intends to testify about the "numerous deleterious psychological outcomes" that sexual abuse victims suffer once the abuse has ended, including "mental disorders," "substance-related disorders," worsened physical health and socioeconomic status, increased sexual risk-taking, "adult relationship difficulties, problems with parenting, and insecure attachments." Ex. A at 10. The negative outcomes sexual abuse victims often suffer after the abuse has ended has no bearing whatsoever on whether Mr. Ephron committed the charged crimes in the indictment, and therefore cannot satisfy the relevance tests of either Rule 702(a) or Rule 401. And the unfair prejudice from parading before the jury the often-terrible outcomes sexual abuse victims later suffer substantially outweighs any slight probative value such testimony could have. Fed. R. Evid. 403.

Finally, Dr. Rocchio's opinion that the "presence of other individuals can also facilitate the sexual abuse of minors by normalizing the perpetrators behaviors and increasing the child's comfort with the perpetrator" is patently inadmissible. Ex. A at 9-10. There is no reliable scientific evidence that this is the case, and Dr. Rocchio's opinion on this subject has been precluded following at least one previous *Daubert* hearing. *Maxwell*, 2021 WL 5283951, at * 5.

### 3. Dr. Rocchio should not be permitted to testify about "coercive control."

Dr. Rocchio's opinions on "coercive control" suffer from many of the same flaws as her "grooming" opinions. Initially, like her testimony on "grooming," her opinions on "coercive control" have no relevance to this case. According to Dr. Rocchio, "coercive control" involves a "strategic pattern of behavior" designed to "attain and maintain control in a relationship," as part of an "ongoing pattern of domination." Ex. A at 10. Here, however, the charged conduct spanned a brief, five-day period, and the alleged underlying sexual assault began almost immediately following the parties' meeting. Dr. Rocchio offers no scientific basis for the conclusion that "coercive control" can be established over such a short period. Indeed, Dr. Rocchio concedes that although it sometimes appears in child abuse situations, "coercive control is commonly discussed in the context of intimate partner violence," indicating that it is a feature of longer-term, typically romantic relationships. Ex. A at 11. Nor is there any allegation that Mr. Ephron kidnapped the complainants or held them against their will. As such, Mr. Ephron's case is a far cry from cases where "coercive control" testimony has been admitted in the past. *See United States v. Ray*, 2022 WL 101911 (S.D.N.Y. 2022) ("coercive control" testimony admitted in case where defendant accused of running a long-term sex cult); *United States v. Torres*, 2021 WL 1947503, at *7 (S.D.N.Y. 2021) (unreported) ("coercive control" testimony admitted to establish whether victim was held against her will, an element of the kidnapping statute under which defendant was charged).

Second, again like her "grooming" testimony, Dr. Rocchio's "coercive control" testimony would relate to the ultimate issue of Mr. Ephron's intent in violation of

Rule 704(b).  Since Mr. Ephron is accused of intentionally coercing the complainants to engage in sexual behavior, expert testimony that perpetrators typically engage in "coercive" tactics "for the purposes" of committing sex crimes represents a direct opinion on the ultimate *mens rea* issue the jury must determine.  In fact, Dr. Rocchio intends to explicitly define the term "coercion" for the jury as "the use of force or threats to compel or dispel a particular response."  Ex. A at 10.  It is well-settled, however, that experts cannot define legal terms or elements of a crime, much less in a way that favors the government's preferred inferences.  *Scop*, 846 F.2d at 140-42 (improper for expert to repeatedly use and define statutory and regulatory language indicating guilt, since doing so invaded the court's province to define the law and the jury's province to apply those definitions to the facts).

Third, Dr. Rocchio's "coercive control" testimony is simply propensity testimony by another name, in violation of Rule 404.  Dr. Rocchio's opinion that perpetrators "typically" or "commonly" utilize coercive control tactics would impermissibly invite the jury to conclude that "because criminals of a certain type classically engage in a certain kind of behavior, the defendant engaged in that behavior."  *United States v. Mulder*, 273 F.3d 91, 102 (2d Cir. 2001).  That is especially problematic here since Dr. Rocchio is unquestionably unqualified to opine about the thought processes of sexual assault perpetrators, never having examined one.

Fourth, as with her "grooming" testimony, Dr. Rocchio's "coercive control" testimony would improperly mirror or summarize the government's evidence.  Dr. Rocchio purports to take a series of behaviors typically present in domestic violence

situations – giving gifts, making decisions about money, micro-managing behavior, and favoring one person over another – and transform them into a psychological behavior attributable to an undefined class of sexual offenders who sometimes engage in them as well. Some of the behaviors Dr. Rocchio claims are examples of "coercive control" largely mirror behaviors the complainants alleged Mr. Ephron engaged in: buying them deodorant, for instance, and favoring one complainant over the other. By taking these innocuous behaviors and opining that they are typical examples of the "coercion" that sexual assault perpetrators sometimes exercise, Dr. Rocchio is doing nothing more than summarizing the government's evidence in a manner designed to lead the jury to the government's preferred outcome. Or, as the Second Circuit has described it, "[I]t is a little too convenient that the Government has found an individual who is an expert on precisely those facts that the Government must prove to secure a guilty verdict." *United States v. Mejia*, 545 F.3d 179, 190-91 (2d Cir. 2008).

Fifth, Dr. Rocchio's "coercive control" testimony is within the ken of the average juror. Any contemporary juror would understand that people sometimes manipulate others, as well as how people engage in manipulation. No expert is needed to help a jury understand that favoring one person over another can be a form of manipulation, or that isolating people can be a way of controlling them.

And sixth, Dr. Rocchio's coercive control testimony would violate Rule 403. As noted, this is not a case of intimate partner violence or long-term sexual abuse. It is not even clear from Dr. Rocchio's expert disclosure if the "coercive control" paradigm

can apply to a situation that spanned only five days and was between relative strangers. By taking a series of isolated behaviors like buying deodorant and labeling them as trademark indications of sexual abuse, Dr. Rocchio's opinions would unduly prejudice Mr. Ephron and unfairly confuse the issues.

### 4.    Dr. Rocchio's opinions on the experiences of "victims of sex trafficking" are entirely irrelevant.

The government proposes to offer Dr. Rocchio's opinion on the experiences of "victims of sex trafficking" and the recruitment tactics that sex traffickers engage in, as well as a definition of "human sex trafficking" from the U.S. Trafficking Victims Protection Act. Ex. A at 11. Dr. Rocchio's opinion on sex trafficking would be totally irrelevant at Mr. Ephron's trial, failing both *Daubert*'s "fit" requirement and Federal Rule of Evidence 401.

Mr. Ephron's case involves no allegation whatsoever of sex trafficking. He is not charged with sex trafficking, nor is there any allegation that he engaged in a commercial sex act with the complainants or caused them to engage in commercial sex acts with others. In fact, discovery contains assurances by the investigating agents that the complainants were *not* trafficked. As a result, Dr. Rocchio's opinion on sex trafficking would not help the jury to "understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), nor would it "relate to any issue in the case." *Daubert*, 509 U.S. at 591. Indeed, her opinions on sex trafficking cannot even satisfy the basic test for evidentiary relevance as they would not have "any tendency to make a fact more or less probable." Fed. R. Evid. 401(a).

And even if Dr. Rocchio's opinions on sex trafficking were relevant, their slight probative value would be dramatically outweighed by their substantial prejudicial effect. Fed. R. Evid. 403. Introducing opinions about and definitions of sex trafficking – in a case where no commercial sex act took place – would confuse the issues, waste the jury's time, and unfairly prejudice Mr. Ephron by injecting emotional, disturbing testimony about child sex trafficking into a trial that has nothing to do with such behavior.

### 5. Dr. Rocchio's proposed testimony on coping strategies is so broad as to be unhelpful.

Dr. Rocchio intends to testify about the types of responses individuals have to sexual assault. Ex. A at 11-12. Her opinion is so broad and general, however, as to be useless to a juror in determining any issues at trial. Fed. R. Evid. 701(a). For instance, Dr. Rocchio will opine that some victims freeze, some bargain, some experience confusion or mental defeat, some verbally indicate non-consent, some remain silent, and some physically resist. Ex. A at 11-12. An opinion that sexual abuse victims respond in every possible way to an assault is useless as an expert opinion. It is also unfairly prejudicial, since it allows a juror to interpret *any* type of response as proof of a sexual assault. Fed. R. Evid. 403.

Likewise, Dr. Rocchio plans to opine that sexual abuse victims use any type of "coping strategy" or "psychological defense." Ex. A at 11-12. Although she lists some coping strategies in her expert disclosure, Dr. Rocchio concedes that sexual abuse victims' coping strategies are "not limited to" those she outlines. *Id.* In other words, Dr. Rocchio will testify that any psychological response could be on that sexual abuse

26

victims display.  Not only is this opinion violative of Rules 702(a) and 403, but it also constitutes improper bolstering of the complainants' credibility.  The complainants will undoubtedly claim they responded to Mr. Ephron's alleged behavior in some way; Dr. Rocchio will then opine that such a response is of the type that sexual abuse victims have displayed in the past.  Such improper bolstering based on such a broad expert opinion cannot be permitted.  *See Cruz*, 981 F.2d at 663 ("[T]he credibility of a fact-witness may not be bolstered by arguing that the witness's version of events is consistent with an expert's description of patterns of criminal conduct," since doing so "strongly suggests to the jury" that the expert "believes the government's witness to be credible and the defendant to be guilty").

### 6.    *Dr. Rocchio's delayed disclosure testimony is both irrelevant and impermissible bolstering.*

The government is offering Dr. Rocchio as an expert on "delayed disclosure," who will opine that "the majority of children do not disclose their sexual abuse during childhood."  Ex. A at 12-14.  Dr. Rocchio wishes to further opine on the factors that lead to delayed disclosure, the types of language victims use to describe sexual abuse, and the types of barriers to disclosure that often exist, including shame, fear, and gender dynamics.

Dr. Rocchio's testimony is not needed for the jury to understand the complainants' behavior.  Delayed disclosure is well-recognized as being within the ken of the average juror.  *See Schneider*, 2010 WL 3734055, at * 6 ("the average juror would understand, without the necessity of expert analysis, why sexually abused children do not always immediately report the abuse") (citing cases).  Under the

circumstances, it is not "apparent why expert testimony is even required, rather than eliciting from the victim testimony that she was embarrassed, and then letting the jury use its common sense." *Raymond*, 700 F.Supp.2d at 152.

Dr. Rocchio's opinion on delayed disclosure is, moreover, unreliable. She intends to opine that the "majority" of sexual abuse victims do not disclose immediately, and that "child sexual assault, including rape, is considered to be among the most underreported crimes." Ex. A at 12-14. These opinions are, of course, "not quantifiable and therefore cannot be utilized to predict whether a particular child victim actually delayed or denied reporting the abuse he or she suffered." *Schneider* 2010 WL 3734055, at *4. Dr. Rocchio provides no statistics for her claim that the "majority" of sexual abuse victims act in a certain way, nor can she possibly know how often child sexual abuse goes unreported. Her opinions on delayed disclosure, then, are not scientifically reliable and contain no methodology other than her own subjective beliefs.

And testimony on delayed disclosure would unfairly bolster the complainants' credibility. By claiming that most sexual abuse victims do not immediately disclose their behavior, ultimately disclose it using specific terminology that mirrors the complainants' language here, and often first outcry to a friend as the complainants here claim happened, Dr. Rocchio is essentially opining that the jury should believe the complainants based on the manner in which they made their allegations against Mr. Ephron. Testimony of this sort both improperly bolsters the credibility of the complainants and violates Rule 403 by "placing an expert's endorsement" on the

complainants' reasons for not immediately disclosing and suggesting "that delayed reporting of child sexual abuse is more consistent with truthfulness than with fabrication." *Schneider*, 2010 WL 3734055, at *7.

> **7.    Dr. Rocchio is not qualified to opine on memory, and her opinions are blatant bolstering of the complainants' credibility.**

Dr. Rocchio finally wishes to opine on the concept of "memory." According to Dr. Rocchio, "[a]utobiographical memory for past events does not resemble a videotape," and "[w]e are always paying more attention to some details than others." Ex. A at 14. Dr. Rocchio will opine that the "details that we are paying attention to and that are emotionally significant to us are referred to as central details, and tend to be accurately recalled over time." *Id.* By contrast, those things we do not pay attention to are peripheral memories, which are "vulnerable to inconsistent and inaccurate recall over time." *Id.* Whether certain memories are central or peripheral is wholly subjective, and the "failure to remember such peripheral details is both normal and to be expected," while "the accuracy of information freely recalled is high." *Id.* Dr. Rocchio then intends to opine on the factors that affect recall of memories and that individuals may experience "voluntary and involuntary forgetting." *Id.*

Initially, Dr. Rocchio is not qualified to opine on memory. There is no indication she has attended any trainings or reviewed any specific literature on the processes involved in forming memories of events. In fact, she has previously conceded that she is "not an expert on neuroscience" and could not identify "the part of the brain that work[s] in connection to form memories" at a previous *Daubert*

hearing. *Maxwell*, 20-Cr-330 (AJN), ECF No. 467, at 121-22. There is simply nothing in Dr. Rocchio's background or training that would qualify her to testify about the processes involved in forming memories.

Nor are Dr. Rocchio's opinions on memory the result of any kind of reliable methodology. There is no way for Dr. Rocchio – or any scientist – to know whether the memories a sexual abuse victim can recall are accurate, or whether those inconsistently recalled memories are true or false. There have, for obvious reasons, been no controlled studies, and there is no known error rate of the accuracy of recall of sexual abuse. The determination of whether a memory is "central" and therefore reliable or "peripheral" and therefore justifiably inaccurate is entirely subjective, based on what a person claims to have been focused on. Ultimately, then, Dr. Rocchio's opinion appears based on a self-fulfilling prophecy: she believes what her patients tell her about the memories they recall, and explains away inconsistent memories as merely "peripheral." Even if Dr. Rocchio's opinions about memory are generally accepted in the scientific community – and it is not clear they are – that does not in and of itself satisfy the *Daubert* inquiry. *See Kumho Tire*, 526 U.S. at 151 (general acceptance does not satisfy *Daubert* "where the discipline itself lacks reliability").

And even if Dr. Rocchio's opinions on memory satisfied the *Daubert* standard, they are blatantly impermissible bolstering. Dr. Rocchio intends to explicitly tell the jury that central memories are accurate, and peripheral memories are justifiably inconsistent. In other words, Dr. Rocchio will opine that what the complainants

remember is highly likely to be true, and whatever they are impeached about on cross-examination is merely a peripheral memory that should be discounted. It is hard to imagine a clearer example of impermissible bolstering. *See, e.g.*, *Lumpkin*, 192 F.3d at 289 (precluding testimony about correlation between confidence of eyewitness identification and accuracy, since it would usurp the jury's role of determining credibility); *see also Nimely*, 414 F.3d at 398 (expert forbidden to opine on witness credibility, even when couched in scientific or technical expertise); *Dugue*, 763 Fed.Appx. at 96 (general testimony about the credibility of cooperators inadmissible). As such, Dr. Rocchio's testimony would violate Rules 403, 404, and 608.

### C. If Dr. Rocchio intends to convey hearsay to the jury, the government should be directed to identify any such statements before trial so that the Court can conduct a Rule 403 balancing test.

Although an expert is entitled to rely upon hearsay in forming her conclusions, she may not disclose such hearsay to the jury unless the statements' "probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 703. And conveying hearsay to the jury through an expert may, depending on the nature of the hearsay statements, violate the Confrontation Clause, particularly when an expert does not apply a methodology to the hearsay statements but instead simply repeats what others have told her. *See Mejia*, 545 F.3d at 198 (expert violated Confrontation Clause when he simply repeated what others told him about workings of MS-13 gang without conducting any sort of analysis); *Dukagjini*,

326 F.3d at 58 (expert's reliance on hearsay violates Confrontation Clause when no application of reliable expertise or methodology to hearsay statements).

Here, the government's expert disclosure provides no clarity on the kinds of information Dr. Rocchio has learned and relied upon during, for instance, her clinical interviews of patients or her review of the literature. There is, however, a serious risk that Dr. Rocchio intends to communicate to the jury information and anecdotes she has learned from sex abuse victims through clinical interviews – anecdotes that may be graphic, disturbing, and highly prejudicial. If Dr. Rocchio has any intention of communicating such hearsay to the jury, either directly or indirectly, the government should disclose what those hearsay statements will be so that the Court can make a pretrial determination of their admissibility. *See, e.g.*, *United States v. Ray*, 20-Cr-110, ECF No. 287, at 25 n.8 (S.D.N.Y. Jan. 11, 2022) (ruling that expert would only be permitted to convey anecdotes that are "reasonably relied by those in the field, if they explain her qualifications and the bases for her opinions, and if they are relevant (particularly given any cross-examination) and their probative value is not substantially outweighed by their prejudicial effect").

\* \* \*

Dr. Rocchio's opinions do not satisfy the *Daubert* standard and violate myriad rules of evidence. The Court should, therefore, preclude her testimony. Alternatively, the Court should order a hearing to determine whether Dr. Rocchio's opinion satisfy the *Daubert* standard.

**IV.    The Court should exclude the testimony of Alfred Hernandez.**

The government offers Hernandez to testify about topics related to drug trafficking including (1) slang and coded language; (2) "tools of the trade"; (3) the differences between MDMA and methamphetamine; (4) & (5) the appearance and pricing of drugs; (6) the use of cellular phones; (7) drug dealers' use of minors to sell drugs; and (8) and drug dealers' use of methamphetamine to coerce and entice minors into sex. These "opinions" are inadmissible for many of the same reasons Dr. Rocchio's testimony is inadmissible.

**A. Hernandez's proposed testimony is generally inadmissible.**

The Second Circuit has long cautioned about the government's use of law enforcement "experts" in the context of drug trials. While affirming that "the operations of narcotics dealers are a proper subject for expert testimony," the Circuit has made clear that such testimony "should normally be used only for subjects that have esoteric aspects reasonably perceived as beyond the ken of the jury." *United States v. Tapia–Ortiz,* 23 F.3d 738, 740 (2d Cir.1994); *United States v. Castillo*, 924 F.2d 1227, 1233 (2d Cir. 1991) (reversing conviction where jury "was entirely capable of understanding the evidence before it and determining the facts in issue without [the government's drug expert's] assistance"). Even if proposed expert testimony from a law enforcement witness is relevant and appropriately specialized, it may not be utilized "to bolster the credibility of the government's fact-witnesses by mirroring their version of events." *Cruz*, 981 F.2d at 664 (reversing where expert testimony about the "behavior" and "modus operandi" of drug dealers in a certain area was

improperly admitted); *see also Rijo*, 508 Fed.Appx. at 45 ("[W]e have prohibited experts from giving an account 'of a typical drug transaction that mirror[s] the testimony of the Government's fact-witnesses'") (citations omitted).

Here, Hernandez is not currently qualified to testify about drug dealing in New York. According to the government, Hernandez will base his opinions on "his training, education, and experience, including his more than 38 years as a law enforcement officer primarily involved in investigating narcotics trafficking." Ex. A at 36. Since 2016, however, Hernandez's full-time employer has been New York City Health and Hospitals, in the Department of Investigations.[2] His primary responsibilities in that role are to "conduct, assist, and supervise in investigations in regards to fraud waste and abuse in the city's public agencies, and [] in particular with the city's hospital system, the health and hospitals corporation." *United States v. Alvin Eusebio*, 22-Cr-522 (GHW), ECF No. 691, at 530 (S.D.N.Y. Nov. 7, 2024). His current full-time position for the past nine years has been outside of the field of narcotics investigations. While Hernandez appears to also be working as a task force officer with the DEA, the government's notice contains no information about what his current level of involvement is with drug investigations, calling into question his current basis of knowledge. At minimum, the Court should hold a *Daubert* hearing to determine the extent to which Hernandez is qualified to provide expert testimony.

---

[2] The government's initial expert disclosure contained a list of Hernandez's qualifications entitled "Background." It did not include a traditional *curriculum vitae* setting forth the start or end dates each job has held, or his duties in each position. Ex. A at 38.

Even if Hernandez is qualified as an expert, the wholesale admission of his testimony would result in exactly the kind of improper bolstering the Second Circuit has repeatedly warned against in the context of so-called "drug experts," since his testimony would merely summarize and mirror the government's evidence. For example, the government plans to offer Hernandez to "explain" that pills marked as ecstasy may be methamphetamine, that drug dealers obtain pills in bulk "such as hundreds or even 1,000 pills at a time," and that drug dealers give methamphetamine to minors to coerce them into sex. These "opinions" are so plainly designed to mirror, and in some cases fill the gaps in, the government's factual evidence that they are improper. *See Mejia*, 545 F.3d at 191 ("[I]t is a little too convenient that the Government has found an individual who is expert on precisely those facts that the Government must prove to secure a guilty verdict"). Instead, by testifying as to his "expert opinions," Hernandez would essentially be acting as a summary witness for the government: a law enforcement officer who synthesizes all the government's evidence in a way that invites the jury to reach the government's proposed inferences, in violation of both the prohibition against bolstering and Rule 403.

Hernandez's proposed testimony writ large similarly constitutes improper propensity evidence in violation of Rule 404. The government intends for Hernandez to discuss, among other topics, Mexican drug cartels, large scale drug manufacturing, and drug dealers who seek to "control" minor sexual targets with methamphetamine, all highly inflammatory topics that impermissibly invite the jury to associate Mr. Ephron with such conduct. See *Mulder*, 273 F.3d at 102 (government may not "ask

the jury to find that because criminals of a certain type classically engage in a certain kind of behavior, the defendant engaged in that behavior"). In the same vein, the government offers Hernandez to impermissibly opine about Mr. Ephron's *mens rea* in violation of Rule 704(b). For example, despite having noticed Hernandez to explain why pills marked as ecstasy may nevertheless be methamphetamine, the government then offers Hernandez to testify that drug traffickers *intentionally* give methamphetamine to minors to coerce them into having sex, and that "[m]ethamphetamine pills marketed as Ecstasy can be used for this purpose." Ex. A at 36. In other words, the government impermissibly seeks to use Hernandez's "expertise" to establish that Mr. Ephron had the requisite mental state to be guilty of the charged coercion offenses. *See Mejia*, 545 F.3d at 190 ("An increasingly thinning line separates the legitimate use of an officer expert to translate esoteric terminology or to explicate an organization's hierarchical structure from the illegitimate and impermissible substitution of expert opinion for factual evidence").

Making matters worse, Hernandez's proposed opinions do not appear to be the result of the application of any expert methodology, but instead are merely an attempt to backdoor inadmissible hearsay into the trial. Hernandez is principally planning to testify about what he has learned from others during the course of drug investigations. There is no methodology he apparently applies to that hearsay information; instead, Hernandez will simply parrot information he has learned through sources in other investigations. He appears to rely on anecdotes obtained from undercovers and informants, which have no proven reliability or known error

rate.  This sort of blanket recitation of hearsay lacking any sort of methodology whatsoever has been repeatedly condemned by the Second Circuit, and violates not only the Federal Rules of Evidence but also the Confrontation Clause.  *See id.* at 197-98 (expert forbidden to "repeat[] hearsay evidence without applying any expertise whatsoever"), *citing Dukagjini*, 326 F.3d at 58-59.

Finally, the government offers Hernandez to testify about subjects that are well beyond the scope of his purported expertise, most notably on the subject of coercion and enticement.  There is no indication that Hernandez has received any kind of specialized training or has any meaningful experience in sex cases – in fact, as his expert disclosure makes clear, his career has primarily been devoted to "investigating narcotics trafficking."  There is absolutely nothing on Hernandez's resume to indicate that he has the necessary training and experience to opine on matters related to sex, coercion, or enticement. "Although the government may ordinarily call on law enforcement officials to decipher drug jargon, district courts, in their role as gatekeepers, must be ever vigilant against expert testimony that could stray from the scope of a witness' expertise." *United States v. Cruz*, 363 F.3d 187, 194 (2d Cir. 2004) (reversing where government's law enforcement drug expert offered testimony outside the scope of his expertise).  At minimum, the Court should hold a *Daubert* hearing to explore Hernandez's qualifications to offer his proffered "expert" opinions.

**B. <u>Hernandez's specific proposed opinions are largely inadmissible.</u>**

Beyond the general objections set forth above, the Court should preclude the following opinions Hernandez seeks to offer.

### 1.    *Hernandez's opinions on slang and coded language are inadmissible.*

The government seeks to offer Hernandez to testify "that drug traffickers commonly use slang to describe their drugs." Ex. B at 5. As noted above, the slang words Hernandez will testify to include "E pill" for Ecstasy pills, "Coke" for cocaine, "Weed" for marijuana," "Crib" for home, and others. *Id.* Those terms, however, are not outside the ken of the average juror, and allowing Hernandez to testify to them would violate Fed. R. Evid. 702(a). *See Castillo*, 924 F.2d at 1233 ("[W]e are not convinced that New York jurors in today's climate, flush with daily news of the latest drug bust, need an expert to enlighten them as to such elementary issues as the function of a scale or index card in a drug deal"); *Rijo*, 508 Fed.Appx. at 45 (in drug case, jury did not need expert testimony to understand the significance of a secret compartment in a car); *United States v. Taylor*, 2025 WL 243391, at *2 (D. Conn. Jan. 20, 2025) (admitting government's expert drug testimony but prohibiting officer witness from "explaining commonly understood phrases"); *United States v. Ojeikere*, 2005 WL 425492, at *5 (S.D.N.Y. Feb. 18, 2005) (precluding government expert and finding "nothing so sophisticated about the alleged advance fee fraud that expert testimony would be useful for the jury.")

### 2.    *Hernandez's testimony about the "tools of the trade" used to produce and distribute narcotics, and about Mexican drug cartels, are irrelevant and unfairly prejudicial.*

The government seeks to offer Hernandez as an expert on a variety of topics concerning the "tools of the trade" of drug trafficking. Ex. A at 35. Yet virtually all the "tools of the trade" testimony the government proffers would be inadmissible.

For instance, the government's expert notice states the following:

> [Hernandez] is further expected to explain that he is familiar with the major cartels operating in Mexico that are responsible for the vast majority of methamphetamine importation into the United States in recent years. These cartels are the Sinaloa Cartel (also known as the Cartel de Sinaloa or "CDS"), and the Jalisco New Generation Cartel (also known as the Cartel de Jalisco Nueva Generacion of "CJNG").

Ex. A at 35. Admitting such testimony would violate several rules of evidence. First, Hernandez's proffered opinions about international drug trafficking, and specifically Mexican drug cartels, are irrelevant. The instant case centers on allegations that Mr. Ephron coerced or enticed, provided drugs to, and sexually assaulted, two teenage runaways whom he met in Times Square. The government alleges that Mr. Ephron possessed drugs and was engaged in hand-to-hand drug sales in Times Square at the time he met the complaining witnesses. Mr. Ephron is not accused of importing or internationally trafficking drugs. There is no indication Mr. Ephron has ever had contact with, or has the slightest knowledge of, Mexican drug cartels, or indeed that he has any knowledge of the source of drugs in the United States at all. Thus, nothing about Hernandez's proffered testimony regarding the Sinaloa Cartel, Jalisco New Generation, or any other Mexico drug cartel "has any tendency to make a fact" alleged in this case "more or less probable," let alone a fact "of consequence." Fed. R. Evid. 401; *Daubert*, 509 U.S. at 591 (proffered expert evidence must "fit" the issues in the

case); *see also United States v. Yevakpor*, 271 Fed.Appx. 19, 22 (2d Cir. 2008) (expressing skepticism about the "breadth" of drug expert's testimony and stating, "It is difficult to see what most of the details to which Mercado testified, outlining the entire operation of the illicit heroin trade, have to do with Yevakpor's alleged role in the operation—that of a mere 'mule,' smuggling drugs from Canada to the United States").

Second, Hernandez's opinions about Mexican drug cartels constitute impermissible propensity evidence. Hernandez and the government would essentially invite the jury to infer Mr. Ephron's guilt based on the unrelated "crime[s], wrong[s], or act[s]" of Mexican drug cartels. Rule 404(b)'s plain language prohibits the use of such propensity evidence, whether about Mr. Ephron specifically or drug traffickers generally, absent express notice and articulation of a permitted exception. Fed. R. Evid. 404 ("Evidence of any other crime, wrong, or act is not admissible to prove a person character in order to show that on a particular occasion the person acted in accordance with the character."); *see also Castillo*, 924 F.2d at 1234 ("[W]e take serious issue with the Government's use of an expert witness to propound the impermissible theory that appellants' guilt could be inferred from the behavior of unrelated persons").

Should the Court find Hernandez's proffered opinions regarding Mexican drug cartels relevant, however, it must nevertheless exclude such evidence under Rule 403. Not only is the slight (in fact, non-existent) probative value of Hernandez's testimony substantially outweighed by its unfair prejudice, but also by its danger of confusing

the issues and misleading the jury.  There is no dispute in this case about where drugs in the United States, including the ones Mr. Ephron allegedly conspired to possess and distribute, come from.  Thus, any mention or discussion of Mexican drug cartels, which are widely portrayed in the media as violent and which the government recently publicly labeled "terrorists,"[3] risks dramatically prejudicing Mr. Ephron while adding nothing to the government's proof.  It would, moreover, confuse the jury by leading it to debate whether Mr. Ephron is somehow connected to ultra-violent and notorious Mexican drug cartels, a proposition for which there is no evidence whatsoever.

Hernandez's remaining testimony about the "tools of the trade" used to produce and distribute methamphetamine and cocaine is inadmissible under Rules 401, 403, and 702.  As with Hernandez's proposed slang/jargon testimony, much of the "tools of the trade" testimony is not outside the ken of the average juror.  For example, it is common knowledge that "cocaine appears as a white powdery substance," that the "markings," color," and "shape" of a pill helps to identify it, that drugs are delivered to customers in "small zip lock bags or other small containers," and that "hand-to-hand drug transactions" happen in places like Times Square.  Ex. A at 35-36.  These

---

[3] *See, e.g.,* Executive Order, *Designating Cartels And Other Organizations As Foreign Terrorist Organizations And Specially Designated Global Terrorists* (Jan. 20, 2025) https://www.whitehouse.gov/presidential-actions/2025/01/designating-cartels-and-other-organizations-as-foreign-terrorist-organizations-and-specially-designated-global-terrorists/ (stating cartels have engaged in a "campaign of violence and terror" throughout the Western Hemisphere and control the US-Mexico border through "assassination, terror, rape, and brute force").

widely known facts are far from "specialized knowledge" that would qualify as appropriate expert testimony under Rule 702.

### 3.  *Hernandez is not qualified to opine on the differences between MDMA and methamphetamine.*

The government wishes for Hernandez, a law enforcement officer, to testify about the differences between MDMA and methamphetamine, including to explain that the latter is "stronger" and "more addictive." Ex. A at 35.  Such testimony is well outside the scope of Hernandez's expertise.  The difference between MDMA and methamphetamine, and all drugs, is chemical, and Hernandez is not a chemist.  He appears to have no background in chemistry or any other scientific discipline.  Indeed, the government has served notice that several *actual* DEA chemists may testify at trial, as will the NYPD criminalist who conducted the drug testing in this case.  Those witnesses are more appropriately qualified to testify about the difference between MDMA and methamphetamine.  Likewise, the difference in the *effects* of those two drugs is a medical or pharmacological question, and Hernandez is not a medical professional.  He has no background or training in medicine, pharmacology, or addiction.  Accordingly, this proffered testimony is outside his purported expertise and inadmissible under Fed. R. Evid. 702.

### 4.  *Hernandez' testimony on the appearance and pricing of narcotics is within the ken of the average juror and mirrors the government's trial evidence.*

Hernandez intends to testify about the appearance of narcotics, but this testimony, like much of his proposed slang/jargon and "tools of the trade" testimony, is well within the ken of the average juror.  For example, the average New York juror

knows that "cocaine appears as a white powdery substance," and that methamphetamine pills (like any pill) "can be made to look like real prescription drugs." Ex. B at 6. Similarly, specialized knowledge is not required to help a juror understand that the shape and color of pills depends on "the type of pill press use[d]" and "whether the pill press user added any dyes." *Id.*; *see Rijo*, 508 Fed.Appx. at 45.

Meanwhile, Hernandez's proposed opinions regarding the pricing of narcotics impermissibly mirrors the government's allegations in this case. Specifically, Hernandez's proposed testimony that drug dealers who obtain pills "in large quantities for later resale – such as hundreds of even 1,000 pills at a time – [and] are typically able to negotiate significant discounts" is transparently designed to bolster the government's extrapolation theory regarding the purported image of a bag of 1000 pills allegedly found on Mr. Ephron's phone. Ex. B at 6. Such close tailoring of expert testimony to the government's theory, particularly when designed to fill critical gaps in the government's evidence, is impermissible. *Cruz*, 981 F.2d at 664.

### 5. *Hernandez's opinions on the use of "trap" phones are within the ken of the average juror.*

The government proffers Hernandez to testify that "street level drug dealers and managers often communicate about their drug trafficking activities … over text message or encrypted messaging applications," and that they use "burner or 'trap' phones to do so in order to avoid detection." Ex. B at 6-7. This fact, however, is well within the ken of the average juror. The government does not need an expert to explain that drug dealers, like everyone else, use phones to communicate, and that drug dealers use "burner" phones to avoid detection. Anyone with a television set or

access to the internet would, in this day and age, know that to be the case. As this proposed testimony is in fact common, rather than specialized, knowledge, its admission would violate Fed. R. Evid. 702(b).

> **6.** **Hernandez's opinions on the use of minors to sell drugs is unreliable, inadmissible on the issue of mens rea, and improper propensity evidence.**

Hernandez plans to testify that drug dealers sometimes use minors to work for them. Ex. B at 7. His opinion on this matter, however, is not quantifiable or falsifiable. Hernandez offers no evidence about how often drug dealers use minors, if doing so is a common occurrence, or if his opinions on this are based on anything more than hearsay or unreliable anecdotes from drug dealers. It therefore fails the *Daubert* standard.

Hernandez's opinion on this topic, moreover, improperly touches on Mr. Ephron's intent in violation of Rule 704(b). Hernandez seeks to testify about the reasons drug dealers "sometimes" use minors, including the minors' lessened criminal exposure. Such an opinion touches on topics related to intent, a subject about which expert testimony is forbidden in a criminal case.

And this testimony would, as noted above, constitute improper propensity evidence, essentially inviting the jury to convict Mr. Ephron based on the actions of others. Such expert testimony is plainly inadmissible. *See Castillo*, 924 F.2d at 1234.

> **7.** **Hernandez is not qualified to testify about drug dealers' use of drugs, specifically methamphetamine, to entice and coerce minors into sex.**

Finally, the government offers Hernandez to testify to the following:

> [M]ethamphetamine pills are also used by drug traffickers to give to the targets of their sexual advances, including minors, with the goal of reducing the minors' ability to resist the dealers' sexual advances. Methamphetamine pills marketed as Ecstasy can be used for this purpose. This is especially true because methamphetamine, as a strong stimulant drug, is highly addictive and, therefore, drug traffickers can use those pills to control their sexual targets, who can become addicted and, as a result, become dependent on the dealers.

Ex. B at 7. This testimony is inadmissible for several reasons. First, as explained above, Hernandez is plainly not qualified to testify about sex offenses or offenses involving minors, having never specialized in such cases or, as far as the government's disclosures reveal, ever worked on such cases. At minimum, given the government's proffer of Hernandez' qualifications, the Court should hold a *Daubert* hearing to explore the validity of Hernandez's purported qualifications to discuss coercion and enticement of minors, sex offenses, or offenses involving minors.

Second, Hernandez's proffered testimony on coercion and enticement is inadmissible under Fed. R. Evid. 403, 404, and 704(b). The government seeks to use essentially "group character evidence" to suggest that people who traffic drugs also use drugs to coerce and entice minors into sexual activity. The inference the government wants the jury to make, of course, is that if Mr. Ephron is guilty of drug dealing, that makes him more likely to be guilty of coercion and enticement. Such propensity evidence is prohibited under Rule 404.

Similarly, Hernandez's proposed testimony violates Rule 704(b), effectively constituting expert opinion testimony on Mr. Ephron's *mens rea* with respect to the coercion charges. And whatever probative value it has would be substantially

outweighed by its prejudicial effect, as the jury would be exposed to details about what is essentially sex trafficking in a case where no charges of sex trafficking have been advanced, and the imprimatur of "expert" testimony on a subject actually outside the expert's expertise will confuse and mislead the jury. *See supra*, Pt. III.B.4; *Cruz*, 363 F.3d at 194 ("When an expert's testimony strays from the scope of his expertise, the testimony may well implicate Rule 403.") (cleaned up).

## V.    Conclusion.

For the reasons set forth above, the Court should grant the motion to preclude the above-reference expert testimony, and in the alternative, hold a *Daubert* hearing.

Dated: New York, New York
         February 7, 2025

                                        Respectfully submitted,

                                        /s/
                                        **HANNAH McCREA**
                                        **AMY GALLICCHIO**
                                        **MICHAEL ARTHUS**

## <u>WORD COUNT CERTIFICATION</u>

The above motion contains 12,272 words.  We have separately filed a request for

permission to file an oversize brief.

Dated: New York, New York
        February 7, 2025

Respectfully submitted,

*/s/* _____
**HANNAH McCREA**
**AMY GALLICCHIO**
**MICHAEL ARTHUS**