```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____        │
│ DATE FILED:___2/18/2025___           │
└─────────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

-against-

SHYMELL EPHRON, a/k/a "Shy",

Defendant.

---

24-cr-418 (MMG)

**OPINION AND ORDER**

MARGARET M. GARNETT, United States District Judge:

Before the Court are Defendant Shymell Ephron's pre-trial motions to (i) sever Count Three from the remaining counts of the Superseding Indictment; (ii) dismiss Counts One, Two, Four, Five, Six, and Seven on grounds of selective prosecution; (iii) suppress evidence seized pursuant to a search warrant of Ephron's apartment; and (iv) suppress Ephron's statements to law enforcement on the day the warrant was executed. The Court heard argument as to whether an evidentiary hearing was necessary on December 9, 2024. For the reasons set forth below, the Court finds that no hearing is necessary to decide the motions, and all of the motions are DENIED.

## FACTUAL BACKGROUND

Defendant Shymell Ephron is charged in a Superseding Indictment with two counts of enticement of a minor to engage in unlawful sexual activity (Counts One and Two), in violation of 18 U.S.C. § 2422(b); one count of conspiracy to distribute controlled substances (Count Three), in violation of 21 U.S.C. § 846; two counts of distribution of controlled substances using a minor (Counts Four and Five), in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(C), 861(a)(1), 861(b), and 861(d)(1); and two counts of distribution of controlled substances to a minor (Counts Six and Seven), in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(C), and

859(a).  All of the charges arise out of events that occurred between May 18 and May 22, 2024;

the narcotics conspiracy charged in Count Three extends slightly longer, from May 2024 through

July 2024.  The Superseding Indictment alleges that Ephron met two teenage girls (Jane Doe-1

and Jane Doe-2) in Times Square on or about May 18, 2024, while he was attempting to sell

drugs.  The girls, ages 15 and 17, respectively, had run away from their homes north of New

York City, and needed a place to stay.  The girls returned with Ephron to the apartment where

Ephron was staying, on West 148th Street in Manhattan (the "Apartment"), and the Superseding

Indictment alleges that, over the course of the next several days, Ephron and one of his associates

engaged in illegal sexual conduct of various kinds with both girls, Ephron gave illegal drugs to

both girls, and Ephron sought to have the girls sell illegal drugs on his behalf and for his benefit.

The girls were recovered by the FBI on May 22, 2024, and returned to the custody of their

parents.[1]

On June 6, 2024, Magistrate Judge Stewart D. Aaron signed a search warrant (the

"Warrant") for the Apartment, authorizing the seizure of a range of items, including the search

and seizure of electronic devices.  *See* Exh. A to Defendant's Memorandum of Law in Support of

his Motion to Suppress ("Suppression Br."), Dkt. No. 46.  The following day, FBI agents and

other law enforcement officers arrived at the Apartment early in the morning to execute the

Warrant.  Ephron was sleeping alone in the Apartment at the time.  He was brought into the

hallway just outside the Apartment by law enforcement officers and placed in handcuffs.  Body-

worn camera ("BWC") footage of the hallway interactions between Ephron and the officers

reveals an agitated Ephron repeatedly questioning the officers as to why they were there and,

---

[1] The Government and the Defendant characterize the details of these events somewhat differently.
Unless otherwise noted, this Opinion relies only on undisputed facts and the allegations of the
Superseding Indictment, taken only as allegations.

when told they had a search warrant for the Apartment, what the warrant was for.  Following a series of officer-safety-related questions about other occupants or weapons in the Apartment, which Ephron answered, one of the officers, TFO Murphy, spoke with Ephron in an apparent effort to get him to calm down.  During this exchange, in between continuing to exclaim "for what" repeatedly, Ephron stated that he needed "to call my mom and my lawyer."  It is unclear from the footage whether TFO Murphy hears this statement, as he responds only to Ephron's query about why the officers are there; in contrast, when Ephron asks a few seconds later to call his mother or his brother, TFO Murphy responds directly and states that he is not going to call Ephron's mother.  Over the course of the next hour or so, while the search is underway, Ephron remains handcuffed in the hallway and occasionally engages with the officers, either by expressing his annoyance at the situation, asking the officers questions, or responding to questions they asked him.

Law enforcement officers seized a number of evidentiary items from the Apartment, including items that field-tested positive for narcotics.  After the illegal drugs were found, officers escorted Ephron to a nearby NYPD precinct for questioning.  Ephron remained in handcuffs during the entire interaction.  FBI Special Agent Goulet and two TFOs were present during the questioning of Ephron at the precinct—notably, TFO Murphy was not present.  Special Agent Goulet reviewed a written Miranda warning form with Ephron before any questioning began at the precinct.  Agent Goulet read the form aloud to Ephron, instructing him to verbally acknowledge each right after it was read (Goulet told Ephron, "just say yes"— although in context it appears likely from the audio that Agent Goulet was advising Ephron that he needed to respond aloud rather than nodding, rather than instructing him as to what answer to give, he does <u>not</u> inform Ephron that he could also say "no" aloud if he did not understand).

Ephron answered "yes" or "I understand" in response to each of the individual rights. At the conclusion of the list, Agent Goulet asked Ephron if he wanted to sign the form, and Ephron signed his name just below the typed text on the form reading "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present."

The subsequent interview with Ephron lasted approximately 40 minutes. Based on the Court's review of the audio recording, all participants remained calm and cordial. Ephron appears lucid and rational, and his responses are appropriate to the questions being asked. In response to specific questions about the two minors who had stayed in his apartment, Ephron initially denied any recollection of the girls, then made an escalating series of admissions about their presence in his apartment, although he consistently denied having sexual contact with either girl. When asked about a used condom with blood on it found in the Apartment, Ephron indicated that a particular woman whom he could call would be able to explain the condom and the blood. Agent Goulet then offered to access Ephron's cellphone so that the woman could be called, and asked Ephron for his passcode to unlock the phone. After some back and forth on this subject, Ephron asked to input the code himself, rather than providing it to the agents. When the agents told him they could not let him touch the phone himself, Ephron agreed to provide his code to the agents if they could then look through the phone together to find the woman he believed could explain the circumstances of the condom. After the agents unlocked the phone and reviewed it with Ephron for a few minutes, Ephron was unable to find the name or contact information he was looking for. The interview ended shortly after.

Ephron was indicted on July 9, 2024, and arrested the following day.

## DISCUSSION

### I.    The Motion to Sever is Denied

Ephron moves to sever Count Three (the narcotics distribution conspiracy from May to July 2024) from the remaining counts in the Superseding Indictment (counts involving sexual conduct and counts involving narcotics, all during the 5-day period in May when the Jane Does were staying in the Apartment with Ephron) for trial.  Ephron asserts that Count Three should not have been joined with the remaining counts under Rule 8(a), and that, even if the counts are properly joined, three primary grounds support severance on account of prejudice under Rule 14: (1) a combined trial will permit the jury to hear mutually inadmissible evidence; (2) a combined trial will substantially burden the defendant's right to testify in his own defense; and (3) a combined trial will burden his ability to dispose of counts short of trial.  *See* Defendant's Memorandum of Law in Support of his Motion to Sever and Dismiss ("Severance Br.") at 11-22, Dkt. No. 43.

Under Rule 8(a) of the Federal Rules of Criminal Procedure, "[t]he indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged. . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). "Rule 8(a) is not limited to crimes of the 'same' character but also covers those of 'similar' character, which means 'nearly corresponding; resembling in many respects; somewhat alike; having a general likeness.'" *United States v. Werner*, 620 F.2d 922, 926 (2d Cir. 1980) (alteration omitted) (quoting *Webster's New International Dictionary* (2d ed.)); *see also United States v. Rivera*, 546 F.3d 245, 253 (2d Cir. 2008) ("Counts that have a sufficient logical connection to each other can

be tried together, as can those where the same evidence may be used to prove each count.")
(internal references omitted).

Here, the substantive narcotics counts (Counts Four, Five, Six, and Seven) are "of the
same or similar character" as the narcotics conspiracy count (Count Three), notwithstanding the
slightly longer time period of the charged conspiracy, as all counts involve the distribution of
narcotics. Indeed, it is common for specific substantive instances of narcotics distribution to be
charged together with the narcotics conspiracy that encompasses them. Second, there can be
little question that the two sexual counts (Counts One and Two) are properly joined with the four
narcotics to/with minors counts (Counts Four through Seven) because they are "based on the
same act or transaction, or are connected with or constitute parts of a common scheme or plan":
all six counts arise out of the interactions between Ephron and the two minor Jane Does over the
course of the five days when the Jane Does stayed at the Apartment with Ephron. Moreover, the
Superseding Indictment alleges, and the Government has proffered that the proof at trial will
show, that the alleged drug distribution to and with the Jane Does was used to facilitate the
alleged sexual abuse charged in Counts One and Two. It follows, therefore, that Count Three
likewise, at a minimum, has a "sufficient logical connection" to the remaining counts such that
they are properly joined under Rule 8(a). The events of the narcotics counts are closely
intertwined with the events of the sexual counts, and substantially the same evidence will be
offered in support of each—including the testimony of the Jane Does, evidence seized from the
Apartment, and evidence from Ephron's cellphone. The only evidence that would be relevant to
Count Three but arguably not relevant to the remaining counts is the evidence of Ephron's arrest
for allegedly selling drugs in Times Square in early July 2024. Given all of the other

commonalities and connection, this alone is not sufficient to support the conclusion that the counts are improperly joined under Rule 8(a).

"Even though distinct offenses have been properly joined under Rule 8, the court may order separate trials or grant a severance under Rule 14 if it appears that the defendant is prejudiced by the joinder." *Werner*, 620 F.2d at 928. However, "[i]n order to prevail, the defendant must show not simply some prejudice but *substantial* prejudice." *Id.* (emphasis added). "Granting separate trials under Rule 14 simply on a showing of some adverse effect, particularly solely the adverse effect of being tried for two crimes rather than one, would reject the balance struck in Rule 8(a), since this type of 'prejudice' will exist in any Rule 8(a) case." *Id.* at 929; *see also United States v. Amato,* 15 F.3d 230, 237 (2d Cir. 1994) ("Given the balance struck by Rule 8, which 'authorizes some prejudice' against the defendant, a defendant who seeks separate trials under Rule 14 carries a heavy burden of showing that joinder will result in 'substantial prejudice.'") (quoting *United States v. Turoff*, 853 F.2d 1037, 1043 (2d Cir. 1988)).

None of the arguments offered by the defendant in support of a severance under Rule 14 amount to sufficient prejudice to overcome the otherwise strong interests in a single trial. First, Ephron argues that a combined trial will allow the jury to hear mutually inadmissible evidence. Severance Br. at 17-20. But Rule 14 severance requires more than just a showing that evidence would be admitted at a joint trial that might not be admissible in a separate trial—otherwise, nearly every request for Rule 14 severance would be granted. Rather, a defendant must show that the admission of evidence that would potentially be inadmissible in separate trials is so prejudicial that the only remedy is severance, as opposed to other available remedies like limiting instructions. *See, e.g., Zafiro v. United States*, 506 U.S. 534, 539 (1993). Ephron has

failed to meet that burden here. Even assuming that evidence of Ephron's July arrest for a retail

narcotics sale would not be admissible in a trial about his interactions with the Jane Does in May

(and the Government has proffered several arguments it would make to admit such evidence, if

separate trials were held), any potential prejudice could be cured with a limiting instruction, and

the Court will entertain such requests at the appropriate time pre-trial. But this factor alone does

not warrant a discretionary severance under Rule 14.

Second, Ephron asserts that a combined trial burdens his right to testify in his own

defense because while he "likely has no testimony to offer with respect to Count Three," he has

"valuable, exculpatory testimony to offer on the [non-coercive] circumstances surrounding" his

interactions with the Jane Does, which would be relevant to a defense on the remaining counts.

Severance Br. at 20-21. This is not sufficient. A "mere unexplicated assertion" of the desire to

testify on some counts and not others is not enough to require severance; "no need for a

severance exists until the defendant makes a convincing showing that he has both important

testimony to give concerning one count and strong need to refrain from testifying on the other."

*Werner*, 620 F.2d at 930. The showing required must include "enough information—regarding

the nature of the testimony he wishes to give on one count and his reasons for not wishing to

testify on the other—to satisfy the court that the claim of prejudice is genuine and to enable it

intelligently to weigh the considerations of economy and expedition in judicial administration

against the defendant's interest in having a free choice with respect to testifying." *Baker v.

United States*, 401 F.2d 958, 977 (D.C. Cir. 1968) (internal references omitted). Not only does

Ephron's motion not include any affidavits on this point, even the brief offers only vague

assertions regarding potential testimony and is entirely lacking in specifics about (i) the

testimony Ephron would purportedly offer at a trial that did not include Count Three; (ii) why he

would be in any way constrained or prevented from offering such testimony at a trial that included Count Three; (iii) any reason why he would be harmed by testifying at a joint trial; or (iv) any explanation of the relevance of asserted testimony regarding "non-coercive" interactions with the Jane Does when the sexual counts may be proven merely by evidence of enticement or persuasion (without proof of coercion) and coercion is not an element at all of Counts Four through Seven. *Cf. United States v. Sampson*, 385 F.3d 183, 191-92 (2d. Cir. 2004); *Werner*, 620 F.2d at 930.

Third, Ephron argues that the joinder of Count Three with other counts deprives him of the ability to plead guilty to some counts and not others. Severance Br. at 21. But Ephron offers no real explanation or authority for this position, other than a reference to the Sentencing Guidelines provision for acceptance of responsibility. Nothing prevents Ephron from pleading guilty to some counts, if that is his preference, and going to trial on others. Indeed, it is not uncommon for defendants in this District to follow that course, especially where they conclude, as Ephron suggests he believes, that evidence is much stronger on some counts than on others. Neither the Court nor, apparently, the defendant has done a full Sentencing Guidelines analysis of total Guidelines exposure in separate sentencings vs. a single sentencing, and it is possible there would be no difference because of the advantages that the Guidelines grouping rules would give Ephron in a consolidated sentencing. Regardless, the mere possibility that the advisory Sentencing Guidelines would be slightly lower if there was a severance *and* Ephron pled guilty to Count Three *and* received credit in a separate sentencing for acceptance of responsibility, when nothing prevents Ephron from pleading guilty to a single count, going to trial on the remaining counts, and then arguing at a consolidated sentencing that the Court should in its

discretion give him a variance for accepting responsibility on that count, is insufficient to overcome the presumption in favor of a single trial.

For all of these reasons, the motion to sever Count Three from the remaining counts for trial is denied.

## II.    The Motion to Dismiss for Selective Prosecution is Denied

Ephron next argues that Counts One, Two, Four, Five, Six, and Seven (in short, the counts that deal only with his interactions with the Jane Does) should be dismissed because they violate Ephron's constitutional due process rights to be free from selective prosecution. Severance Br. at 22-27.  In the alternative, Ephron seeks discovery regarding law enforcement efforts to investigate other men who may have committed similar crimes against the Jane Does. *Id*.

Ephron bases his motion on the information gleaned from the Government's discovery production:  specifically, that the Jane Does told law enforcement that, during the time they were away from home, men other than Ephron gave them illegal drugs and engaged in illegal sexual conduct with them of various kinds.  As far as Ephron is aware, none of these other men have yet been charged with these crimes (unlike Ephron).  This set of facts does not make out a due process violation.

It is an unfortunate reality of law enforcement activity and criminal prosecution that only a relatively small percentage of offenders are charged with the crimes they commit.  And the reasons why one person may be charged and another person who engaged in the same conduct may never be caught or charged often come down to factors unrelated to relative culpability, such as availability of evidence or witnesses, happenstance, or simple dumb luck (for good or for ill).  The mere existence of uncharged persons who purportedly engaged in the same criminal

conduct as a charged defendant does not violate the due process of the charged defendant.  Nor is the Government required, in such a situation, to explain or justify to the charged defendant why the others are uncharged.

Here, the minor victims were located based on video surveillance after using a public LinkNYC phone on the sidewalk.  Unfortunately for Ephron, further video canvassing tracked the minor victims entering Ephron's apartment building.  The girls were recovered by law enforcement in the lobby of that building the following day.  Security video from inside the lobby showed Ephron talking to the girls near the elevator shortly before law enforcement arrived, and the girls were later able to identify for law enforcement the specific apartment in that building where they had been staying and the name by which they knew Ephron ("Shy," an obvious diminutive of "Shymell," Ephron's first name).  Law enforcement thus had a strong headstart in identifying Ephron, gathering additional evidence to investigate the minor victims' statements about his conduct, and ultimately seeking warrants to search his apartment and subsequently arrest him for the charged crimes.

A defendant seeking the dismissal of charges based on allegations of selective prosecution bears a heavy burden, given the breadth of prosecutorial discretion and the presumption of regularity that attaches to the exercise of that discretion.  *See United States v. Armstrong*, 517 U.S. 456, 463-64 (1996).  Here, Ephron must show that he was "singled out" and treated differently from others "similarly situated," *United States v. Fares*, 978 F.2d 52, 59 (2d Cir. 1992), and, second, that the differential treatment has been "invidious or in bad faith, *i.e.*, based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights," *id.*  Ephron has not come close to meeting this standard, neither identifying others who are similarly situated both in terms of conduct and strength of evidence

against them, nor making even a facially plausible argument that his charges and prosecution are motivated by any impermissible consideration. At most, Ephron asserts that his purported invocation of his right to counsel at the time of the search of his apartment, followed by his indictment a month later, demonstrates that he was indicted as some kind of retaliation for the assertion of that right. Even if Ephron had satisfied the first prong of the *Fares* test, which he has not, this argument would not satisfy the second prong. First, the Government does not even agree that Ephron effectively invoked his right to counsel, and the actions of the agents at the time of his interview likewise do not suggest that they believed he had invoked that right. Nor is there any indication that any of the prosecutors involved in this case had listened to the agents' body-worn camera footage prior to the decision to seek an indictment of Ephron. Second, even if what Ephron now claims was an invocation of his rights was known to the prosecutors prior to his indictment, there is no indication whatsoever that it played any role in Ephron's prosecution. That purported invocation did not even occur until *after* the prosecutors had secured a judicially-authorized search warrant for Ephron's apartment, based on an affidavit that laid out the evidence they had already gathered in detail, including the victims' statements about the narcotics conduct and the criminal sexual conduct that forms the basis for the charges in this case.

In sum, nothing in this case suggests that Ephron was targeted in any improper way, that he was treated differently than any other person who engaged in the same conduct (other than through the random bad luck of being readily identifiable by law enforcement), or that any of the events in this case leading to his indictment were undertaken for any retaliatory purpose. Accordingly, the motion to dismiss charges on grounds of selective prosecution is denied, as is

the request that the Government turn over documents from any ongoing criminal investigations of persons who are not the defendant in this case.

## III.    The Motion to Suppress the Evidence Seized from the Apartment is Denied

Ephron next moves to suppress any evidence seized from the Apartment in the course of executing the Warrant signed by Magistrate Judge Aaron on June 6, 2024, arguing that the Warrant lacked particularity and was overbroad, and that the Warrant was so facially deficient that the good faith exception should not apply. In opposition, the Government asserts that Ephron lacks standing to challenge a search of the Apartment, as well as opposing Ephron's other arguments. For the reasons set forth below, the Court finds that Ephron has standing to challenge the search, but that the Warrant is valid and, even if it were not valid, the good faith exception would apply and defeat suppression, and accordingly the motion to suppress evidence seized from the Apartment is denied.

### A.  Ephron has Standing to Challenge the Search

The Government's argument on standing is primarily based on Ephron not being a named tenant on the lease, and an assertion that his purported subtenancy was invalid because he did not have the permission of the landlord, as would have been required by the terms of the underlying lease. *See* Government's Brief in Opposition ("Gov't Opp."), Dkt. No. 56, at 18-20. Ephron, in contrast, offered two declarations from his brother: one attached to his original motion and one attached to his reply brief, both asserting personal knowledge that Ephron resided in the Apartment, with the reply declaration adding additional details regarding how the sub-tenancy was arranged. *See* Dkt. No. 66, Exh. 1. In addition, it is undisputed that the Jane Does lived in the Apartment with Ephron for several days in May 2024, and consistently described the

13

Apartment as the place where Ephron lived.  The affidavit to search the Apartment also described, with supporting details, the Apartment as Ephron's residence.

The touchstone of Fourth Amendment standing is whether the person challenging the search has a reasonable expectation of privacy in the place that was searched; in other words, a privacy interest that society is prepared to recognize as reasonable.  Given the facts of this case, and the common and widespread social expectations around subletting apartments in New York City, the Court agrees with the Defendant that his residence in the Apartment as a subletter creates a reasonable expectation of privacy, even absent the express permission of the landlord as required by the underlying lease.  While there may well be circumstances in which an "illegal" subletter would not have standing, the Court need not reach the question of all possible subletting arrangements to conclude here that Ephron's circumstances were far afield from the squatters and burglars featured in the cases cited by the Government.  At worst, Ephron has established that he was more akin to an extended overnight guest in the Apartment—a status that brings him well within the circle of standing approved by the Second Circuit.  *See, e.g., United States v. Osorio*, 949 F.2d 38, 41 (2d Cir. 1991); *United States v. Ray*, 541 F. Supp. 3d 355, 380-81 (S.D.N.Y. 2021).

### B.  The Warrant is Valid

Ephron argues that the fruits of the search of the Apartment must be suppressed because the Warrant approved by Judge Aaron lacked particularity and was overbroad.  Suppression Br. at 14-24.  Ephron's argument proceeds in two parts:  first, that the Warrant lacked particularity and was an impermissible "general warrant," in part because the Warrant failed to attach the supporting affidavit or expressly incorporate it by reference; and second, that the Warrant was overbroad even considering the affidavit, because it allowed seizure of evidence predating

14

Ephron's encounter with the Jane Does by about six weeks and because it allowed the search of electronic devices for evidence related to gun possession although the affidavit contained no specific allegations of the use of electronic devices or communications in connection with guns. Each of these arguments fail.

The Fourth Amendment's particularity requirement mandates that a warrant (1) "identify the specific offense for which the police have established probable cause"; (2) "describe the place to be searched"; and (3) "specify the items to be seized by their relation to the designated crimes." *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017) (quoting *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013), *overruled on other grounds by Carpenter v. United States*, 138 S. Ct. 2206 (2018). Overbreadth is a related concept that lives at the "intersection point for probable cause and particularity principles: it recognizes, in pertinent part, that a warrant's unparticularized description of the items subject to seizure may cause it to exceed the scope of otherwise duly established probable cause." *United States v. Wey*, 256 F. Supp. 3d 355, 382 (S.D.N.Y. 2017) (Nathan, J.). The overbreadth doctrine thus requires that the warrant's description of the objects to be seized may not be "broader than can be justified by the probable cause upon which the warrant is based." *Galpin*, 720 F.3d at 446 (internal references omitted). "[B]readth and particularity are related but distinct concepts." *Ulbricht,* 858 F.3d at 102. "A warrant may be broad, in that it authorizes the government to search an identified location or object for a wide range of potentially relevant material, without violating the particularity requirement." *Id.*

Here, the Warrant itself sets out, in a four-page attachment incorporated on the face of the Warrant, (i) a detailed description of the premises to be searched, with photographs of the relevant entryways; (ii) a list of the specific crimes as to which officers could search for

15

"evidence, fruits, and instrumentalities," both by statutory citation and by summary description; (iii) an 18-item list of specific examples of the kinds of evidence and items to be seized; and (iv) further detail regarding the search, seizure, and review of electronically stored information. *See* Suppression Br., Exh. A.  These search details sufficiently meet the particularity test set out in *Ulbricht* and are consistent with search warrants routinely upheld against similar particularity challenges in this District.  *See, e.g., United States v. Kidd*, 386 F. Supp. 3d 364, 374-75 (S.D.N.Y. 2019) (collecting cases).  The Defendant's argument that, in order to satisfy the particularity requirement, the Warrant was required to specify the particular manner in which he was alleged to have committed the crime of enticement of a minor finds no support in the caselaw and this Court rejects it as well.  Likewise, the mere fact that many items within a residence could contain evidence of the DNA of the occupants does not render a warrant authorizing the collection of such items invalid—particularly here, where the Warrant provides numerous specific examples of the kinds of items to be seized, as a further guide to the officers executing the Warrant.  The Warrant satisfies the particularity requirements of the Fourth Amendment.

Ephron's overbreadth argument is similarly unavailing.  He argues that the Warrant was unconstitutionally overbroad because it authorized a search for all categories of evidence from April 1, 2024, onward when, he argues, the affidavit did not establish probable cause for Ephron's engagement in any of the charged crimes prior to the dates in May when he was with the Jane Does.  Probable cause is a "flexible, common-sense standard," *Texas v. Brown*, 460 U.S. 730, 742 (1983), and the "task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."

*Illinois v. Gates*, 462 U.S. 213, 238 (1983).  Here, based on the allegations in the accompanying

affidavit, it was reasonable for the magistrate judge to conclude that a narcotics conspiracy likely

existed for a modest period of time prior to the direct evidence of retail sale presented in the

affidavit, and also that a person likely acquired a firearm within some modest period of time

prior to telling another person that he kept a gun in the Apartment.  *See, e.g.,* Suppression Br.,

Exh. B at pp. 18-21.  These are entirely reasonable conclusions, and approximately six weeks is

an entirely reasonable time period, particularly given that the Defendant cannot point to a general

requirement that a time period be specified at all in order for a warrant to be valid.  *See, e.g.,*

*United States v. Triumph Capital Grp.*, 211 F.R.D. 31, 58 (D. Conn. 2002).  The argument also

fails because, as for Ephron's other overbreadth argument regarding the lack of specific

connection between the firearms crime and the electronic devices, Ephron cannot point to a

single piece of evidence seized that would not have been seized or a single aspect of the search

conducted that would have been done differently if the Warrant had been limited to, say, May

15, 2024 forward for evidence of the enticement crimes, or if the electronic device portion of the

Warrant had been expressly limited to evidence of the enticement and narcotics crimes.[2]  All of

the categories of evidence delineated in the Warrant are rationally related to one or more of the

underlying crimes on which the Warrant was based, and there was probable cause sufficient to

authorize their seizure.  Accordingly, there is nothing to suppress.  The Defendant's claim that

the entire search and all evidence seized should be suppressed because theoretically there *could*

have been an item seized that existed only in the date range of April 1 to May 15, is a result that

---

[2] Ephron does not contest the probable cause for these portions of the Warrant, but challenges only the time period of April 1, 2024 through approximately May 15, 2024, and the inclusion of the firearms offense in the ESI portion of the Warrant.

would turn the severability analysis of *United States v. Galpin* on its head.  *See* 720 F.3d at 448-50.

### C.  Even if the Warrant Were Not Valid, the Good Faith Exception Applies

Even if the Warrant was defective in some manner, suppression would not be warranted because the executing officers relied in good faith on the validity of the Warrant.  Evidence seized pursuant to a deficient warrant is admissible under the good faith exception unless a "reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization."  *United States v. Leon*, 468 U.S. 897, 923 n.23 (1984).  Exclusion of evidence "has always been [the] last resort." *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010).  The Supreme Court has articulated four circumstances in which the good faith exception does not apply and seized evidence must be excluded: "(1) [W]here the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (*citing Leon*, 468 U.S. at 923).

The Defendant does not argue that Magistrate Judge Aaron was misled or "wholly abandoned" his judicial role.  Rather, the argument against application of the good faith exception rests on the same lack-of-particularity argument rejected above—that the Warrant did not describe the factual manner in which the target subject was alleged to have committed the specified enticement crimes.  Suppression Br. at 24-25.  The lack of factual narrative beyond specifying the offense in both statutory form and plain-English description does not render the

Warrant insufficiently particular and *a fortiori* cannot override the good faith exception and justify the "last resort" of exclusion.

## IV.    The Motion to Suppress Ephron's Statements at the Precinct is Denied

Finally, Ephron moves to suppress the Mirandized statements he made at the precinct[3] after the execution of the Warrant, including the provision of the passcode to his cellphone, on three alternative grounds: (i) that he invoked his right to counsel and thus any post-invocation questioning must be suppressed; (ii) that his written waiver of his *Miranda* rights was not knowing and voluntary; and (iii) that his statements were involuntary.  Suppression Br. at 25-40. In response, the Government argues that the interaction between the officers and Ephron outside the Apartment during the search was not a *Miranda* interrogation, that Ephron's mention of a lawyer was not sufficient to invoke his right to counsel, that even if it were an invocation Ephron voluntarily re-engaged with the officers, that Ephron's later *Miranda* waiver was knowing and voluntary, that his interview statements were voluntary, and that the provision of the passcode should not be suppressed because the Government would have inevitably discovered the contents of the phone even without the passcode.  Gov't Opp. at 28-55.

### A.  Ephron's Mention of Calling His Lawyer was Not in Context of Questioning

*Miranda v. Arizona*, 384 U.S. 436, 439 (1966), establishes a number of "prophylactic rights," including the right to have counsel present during custodial interrogation so as to "assure that the individual is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself."  *Miranda* also provides that officers must cease custodial interrogation if a suspect indicates "that he wishes to consult with an attorney before speaking."

---

[3] The Government has affirmed that it does not intend to offer any statements Ephron made in the hallway outside the Apartment as evidence in its case-in-chief, Gov't Opp. at 32, and accordingly the Court considers only Ephron's motion to suppress the statements made following the *Miranda* warnings at the precinct.

*Id*. at 444-45.  *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), bars officers from restarting interrogation of a suspect following a request for counsel to be present, as a further "second layer of prophylaxis for the *Miranda* right to counsel," *McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991).  In *McNeil,* the Supreme Court clarified that the *Edwards* bar applies "only when the suspect has expressed his wish for the particular sort of lawyerly assistance that is the subject of *Miranda.*  It requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police*."  *Id.* at 178 (internal references omitted, emphasis in original).  In *Davis v. United States*, 512 U.S. 452, 459 (1994), the Supreme Court further limited the prophylactic rule of *Edwards* to situations where a suspect clearly and unambiguously requests the presence of counsel before answering questions, and the articulation of the desire to have counsel present must be sufficiently clear that a reasonable police officer under the circumstances would understand the statement to be a request for the presence of an attorney before answering any further questions.

The Government does not appear to dispute that Ephron was in custody when he was handcuffed in the hallway outside the Apartment, and so the Court presumes as much in deciding the motion.  Thus, the relevant questions are only whether the interaction between the officers and Ephron in the hallway constituted "interrogation" within the meaning of *Miranda* and its progeny, and whether Ephron's statement that he "need[ed] to call my mom and my lawyer" ought to be treated as a clear and unambiguous request for the assistance of counsel in responding to custodial interrogation that would have been understood as such by a reasonable

officer under the circumstances.[4]  Moreover, because the Government has disclaimed any intent

to offer Ephron's hallway statements in evidence in its case-in-chief, the question of whether

Ephron was under interrogation is only relevant to the extent it sheds light on the circumstances

of Ephron's statement that he "need[ed] to call my mom and my lawyer," and how those

circumstances illuminate the objective test under *Davis*.  All questioning by police is not

"interrogation" in this sense.  For example, officers may ask questions necessary to secure their

own safety or public safety without constituting interrogation within the meaning of *Miranda*,

*New York v. Quarles*, 467 U.S. 649, 658-59 (1984), and officers effectuating a search warrant or

an arrest may introduce themselves and explain why they are there or provide other information

to a suspect without constituting a *Miranda* interrogation, *see, e.g., United States v. Rico*, 2019

WL 4014826, at *21 (S.D.N.Y. Aug. 26, 2019).

        The Court has carefully reviewed the full set of BWC footage submitted as exhibits to the

Suppression Motion, multiple times.  Following a few initial questions that are clearly safety-

related and geared towards whether there was anything or anyone in the Apartment that could

pose a threat to the officers executing the Warrant, and to which Ephron says nothing

incriminating, the remainder of the interaction between Ephron and TFO Murphy prior to

Ephron's statement about needing to call his mom and his lawyer centers entirely around TFO

Murphy trying to explain to Ephron why the officers are there and what they are doing, and

Ephron, on the other hand, agitatedly and repeatedly asking what the search warrant is "for" and

then speculating that it relates to a recent order of protection he had sought and possible

---

[4] As noted above at page 3, it is far from clear from the BWC footage that TFO Murphy or any other
officer actually heard Ephron make this statement.  However, for purposes of this motion the Court will
assume, without deciding, that TFO Murphy did hear the statement.

retaliation against him by the subject of the order.[5]  In an apparent effort to calm Ephron down and figure out what he is asking about, TFO Murphy asks a few related clarifying questions about what the order of protection is and who is the subject of it, and whether it relates to a pending domestic violence proceeding.  These interactions are not "interrogation" within the meaning of *Miranda*, as they are not "reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  An order of protection is a matter of public record, as would be any pending charges for domestic violence, and responses clarifying who sought the order of protection and who was its subject, and whether there were any charges in connection with it, are not reasonably likely to be incriminating, particularly not in the context of the recorded interaction between TFO Murphy and Ephron.  Viewed in this full context, in a video-and-audio-recorded interaction, the Court concludes that Ephron was not under interrogation in the hallway outside the Apartment, and that even if the officers' questions could be characterized as interrogation (which the Court believes they are not), Ephron's reference to needing to call his mother and his lawyer would not have been understood by a reasonable officer to be a request for the assistance of a lawyer before answering any further questions.  Rather, the most reasonable interpretation of the statement, in context, was the expression of a desire to talk to the lawyer who knew about the order of protection, given Ephron's apparent belief, as expressed through his statements and conduct, that the presence of the officers and the Warrant were some kind of retaliatory action by the subject of that protective order.  That reasonable interpretation would only have been reinforced by Ephron's continued engagement with TFO Murphy after making the statement, seeking to get information from TFO Murphy

---

[5] Another officer's question about whether Ephron's phone was in the Apartment does not change this analysis, for substantially the reasons set forth in the Government's opposition at page 35.

about what the officers were searching for, why they were there, and who had sent them.[6]
Accordingly, Ephron's statement did not trigger the *Edwards* bar on any further questioning.

### B. Ephron Re-initiated Conversation with Officers

Even if Ephron's statement about calling a lawyer was a sufficient invocation to trigger
the *Edwards* bar on further questioning, his own initiation of "further communication,
exchanges, or conversations with the police," *Edwards*, 451 U.S. at 485, would have opened the
door to further interrogation and would suffice to overcome the *Edwards* bar.  *See* Gov't Opp. at
37-38 (citing examples of Ephron's initiation of further communication); *Oregon v. Bradshaw*,
462 U.S. 1039, 1044 (1983) (suspect, post-invocation, asking "well, what is going to happen to
me now?").  Accordingly, for this reason as well, the agents did not violate Ephron's *Miranda*
rights by initiating a custodial interrogation once they arrived at the precinct with Ephron after
his arrest.

### C. Ephron's Miranda Waiver and His Post-Waiver Statements Were Knowing and Voluntary

Ephron next challenges the voluntariness of his waiver of *Miranda* rights at the precinct
and of his post-waiver statements in response to interrogation.  The Government bears the
ultimate burden to establish "by a preponderance of the evidence that a suspect waived his
*Miranda* rights, and that his confession is truly the product of free choice."  *United States v.
Anderson*, 929 F.2d 96, 99 (2d Cir. 1991).  That inquiry focuses on "the totality of circumstances
surrounding a *Miranda* waiver and any subsequent statements to determine knowledge and

---

[6] The Court recognizes that post-invocation responses to further interrogation may not be relied upon to
create ambiguity in what otherwise would be a clear and unambiguous invocation of a desire for counsel
to be present for any interrogation. *Smith v. Illinois*, 469 U.S. 91 (1984).  However, where, as here, the
claimed invocation is, at best, ambiguous, the totality of the circumstances may be used to shed light on
the objective "reasonable officer" test prescribed by *Davis*.  In any event, the Court finds that Ephron did
not invoke his right to counsel within the meaning of *Miranda* and its progeny, even without considering
Ephron's continued engagement with the officers after the statement was made.

voluntariness." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014).  The totality of the

circumstances to be considered generally encompasses three categories: "(1) the characteristics

of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement

officials." *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018), quoting *Green v. Scully*, 850

F.2d 894, 901 (2d Cir. 1988) ("No single criterion controls whether an accused's confession is

voluntary.").  The Supreme Court has placed particular emphasis on the third category, holding

that "coercive police activity is a necessary predicate to the finding that a confession is not

'voluntary' within the meaning of the Due Process Clause," *Colorado v. Connelly*, 479 U.S. 157,

167 (1986), while recognizing that there is "no talismanic definition of 'voluntariness,'

mechanically applicable to the host of situations where the question has arisen." *Schneckloth v.

Bustamonte*, 412 U.S. 218, 224 (1973).  The Second Circuit broadly defines "voluntary" to mean

"the product of a free and deliberate choice rather than intimidation, coercion, or

deception," *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011) (internal references

omitted), and thus that a confession is not given voluntarily when "obtained under circumstances

that overbear the defendant's will at the time it is given," *Anderson*, 929 F.2d at 99.

Ephron's interview at the precinct was audio-recorded, and the Court has listened to the

audio recording multiple times, as well as giving careful consideration to the declaration of the

defense expert, Dr. Krellman.  There is no dispute that Ephron signed a written *Miranda* waiver

form, which was read aloud to him while he had the paper form in front of him to read before he

signed.  Ephron arrived at the precinct, handcuffed, slightly less than two hours after officers had

arrived at the Apartment to execute the Warrant.  The interview at the precinct lasted less than an

hour.  Although the audio recording is ambiguous as to whether Ephron remained handcuffed

during the interview, the Government concedes that he was, and in any event there is no dispute

that the interview was "custodial" within the meaning of *Miranda*. At no time during the interview do any of the officers raise their voices, threaten Ephron, offer him inducements, or otherwise engage in any misconduct whatsoever.[7]

First, as to Ephron's waiver of his *Miranda* rights, the Court finds that the Government has met its burden to show by a preponderance of the evidence that the waiver was knowing and voluntary and not the product of improper law enforcement coercion. The totality of Ephron's interactions with the officers outside of the Apartment (which is audio and video recorded) and during the interview (which was audio recorded),[8] support a conclusion that Ephron understood the rights that were being stated to him sufficiently to voluntarily waive them. While Agent Goulet's statement that Ephron could respond to each individual right by "just say[ing] yes" was not ideal and the Government should so advise Agent Goulet, the context is more consistent with instructing Ephron that he must give verbal responses for the audio recording than as a substantive instruction that Ephron understood to mean that he could not say "no" or otherwise decline to waive. Even if Ephron had understood Agent Goulet's statement as an effort to instruct him on what response to give, the totality of the circumstances does not support a conclusion that Ephron's free will was overborne by that statement, including Ephron's insistent

---

[7] Ephron does not allege any physical contact during the interview, and there is no suggestion of any such conduct on the audio, although there is no video recording. Ephron attempts to characterize the officers' disclaiming of interest in the drugs found in his apartment as "clearly false" and improperly deceptive, Suppression Br. at 34, but the statements in context do not support that conclusion. The officers do not pretend to be uninterested in the drugs in Ephron's apartment—to the contrary, they make clear their interest in whether Ephron gave drugs to the Jane Does or asked the Jane Does to sell drugs for him (both of which Ephron denies). *See, e.g.,* Suppression Br. Exh. G at 17. To the extent the officers are downplaying the significance of the drugs found in Ephron's apartment, such passing remarks are a far cry from constitutionally improper coercive deception, and nothing about Ephron's responses (almost universal denials) supports the claim in the defense brief that he was misled into thinking he could freely admit to drug activity without consequence.

[8] The transport of Ephron from the Apartment to the precinct was not recorded. However, Ephron has not challenged anything that occurred during that brief transfer.

interactions with TFO Murphy outside the Apartment, his response of "I understand" (rather than simply "yes") to the last of the rights, his signing of the form after Agent Goulet asked him an open-ended question ("do you want to sign?"), and his conduct during the subsequent interview—none of which suggests a person cowed into submission or lacking understanding of his situation.  In any event, such written and signed waivers are generally valid unless officers used "techniques and methods offensive to due process or other circumstances in which the suspect clearly had no opportunity to exercise a free and unconstrained will."  *Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (internal references omitted).  No such circumstances are apparent here.

Rather, Ephron relies heavily on the declaration of Dr. Krellman to support an argument that the asserted quickness of the reading of the waiver form, combined with the cognitive deficits in Ephron's aural and written comprehension skills, created the possibility that his waiver was not knowing or voluntary.  Suppression Br. Exh. I.  However, courts have generally rejected arguments of this type in the face of contrary objective evidence that the defendant acted knowingly and voluntarily, and in the absence of evidence of law enforcement misconduct, coercion, or intimidation such that the defendant's will was overborne.  *See, e.g.*, *Alvarez v. Keane*, 92 F. Supp. 2d 137, 150 (E.D.N.Y. 2000) (collecting cases involving below-average IQ, limited education and reading ability, intoxication, and drug use).  The "totality of the circumstances" review of a *Miranda* waiver includes the characteristics of the accused, *Favre v. Michael C.,* 442 U.S. 707, 725 (1979), and even if a confession is given voluntarily, it may nonetheless be inadmissible if a person lacks the mental capacity to waive knowingly and intelligently.  At the same time, "[a] waiver of the right to remain silent is not invalid merely because a defendant is of limited mental capacity." *Toste v. Lopes*, 861 F.2d 782, 783 (2d Cir.

1988) (finding that petitioner waived his *Miranda* rights "[d]espite his low intelligence"); *United States v. Male Juvenile*, 121 F.3d 34, 40 (2d Cir. 1997) ("[t]he evidence of defendant's disabilities does not show that defendant was so incompetent that he was not aware both of the nature of the right being abandoned and the consequences of the decision to abandon it") (quoting *Colorado v. Spring*, 479 U.S. 564, 573 (1987)); *United States v. Murgas*, 967 F. Supp. 695, 706-08 (N.D.N.Y. 1997) ("while [defendant] presented evidence he has a below average IQ, limited education, and impaired reading ability, these limitations do not preclude a finding that he made a knowing and intelligent waiver of his *Miranda* rights").  The Court takes at face value Dr. Krellman's conclusions regarding Ephron's below-average IQ, 4th-grade reading level, and other cognitive challenges.  Nonetheless, even Dr. Krellman does not conclude that the deficits he observed when evaluating Ephron in the jail are incompatible with understanding or voluntarily waiving his *Miranda* rights, but only that it is possible or, at best, likely that they would interfere with understanding.  Weighed against the totality of the circumstances observed in the video and audio-recorded interactions between Ephron and law enforcement leading up to the signing of the waiver, the Court finds that Dr. Krellman's report is insufficient to overcome the objective evidence that Ephron's waiver was valid and the product of free will.[9]

Review of Ephron's statements during his audio recorded interview with the officers at the precinct further confirms his knowing and voluntary participation in the interview.  In the

---

[9] There is an unacknowledged tension between the defense arguments regarding Ephron's asserted invocation of his right to counsel and the position that he is so cognitively impaired that he could not knowingly and voluntarily waive his rights to remain silent or have counsel with him for questioning.  It is difficult to reconcile the assertion that, outside the Apartment, having just woken up, and without any prompting by officers, Ephron understood that he was being questioned or would soon be questioned and unequivocally invoked his right to have a lawyer present for that questioning, with the argument that his cognitive impairments meant either that he could not understand his rights when they were explicitly explained to him in oral and written form while in a police station or could not exercise his free will regarding those rights.

recording, Ephron appears alert and conversational, even joking with the officers at times.  Far from having his will overborne or simply saying what he may have thought the officers wanted him to say, he generally denies knowledge of anything potentially inculpatory or minimizes the inculpatory nature of information.  When he volunteers additional information, it is generally to provide context that would be helpful to him, if true—particularly in connection with his interaction with the Jane Does.  Ephron first denies any recollection of two teenage girls staying with him in the Apartment just two weeks prior, then acknowledges meeting the girls and letting them come to the Apartment to shower and prepare food, then eventually acknowledges letting them stay in the Apartment overnight but steadfastly denies any sexual contact with either girl. Nothing in the interview is suggestive of involuntary participation, a suspect who does not understand what is happening, or someone whose will is overborne by coercion or deceptive law enforcement conduct.

    The interaction over Ephron's cellphone near the end of the interview is equally illustrative.  Upon being confronted with questions about a bloody condom found in the Apartment, Ephron states that it can be explained by a sexual encounter with an adult woman who began menstruating during the encounter, and offers to contact the woman so that she can corroborate his explanation.  *See* Suppression Br. Exh. G at 27-30.  When Ephron says that he thinks the woman is currently "online," the officers offer to use Ephron's phone and ask for his passcode to unlock it.  Ephron is clearly hesitant to provide his passcode and the recording suggests him weighing the pros and cons of providing his passcode to law enforcement vs. losing the opportunity to provide information that could be helpful to his situation.  He tries to negotiate with the officers, suggesting that he enter the passcode and then they could both look at the phone together.  The officers tell him that they can't let him enter anything into the phone

(standard practice for phones that have already been seized as evidence, as Ephron's had been pursuant to the Warrant), but if he tells the officers his passcode, they will unlock the phone for him and help him search for the woman's contact information so that he can call her. [10]  Ephron eventually provides the passcode and then once the phone is unlocked he begins looking through to find his messages with the woman and thus her contact information.  As with other parts of the interview, the totality of the circumstances is consistent with Ephron making a free choice to provide his passcode so that he can get something he wants (the name and contact number of someone whom he believes can provide exculpatory information for him).  Ephron's situation may have presented him with a difficult decision, with pros and cons, but that does not render it coercive within the meaning of *Miranda* and its progeny, nor did the conduct of the officers regarding the passcode amount to unconstitutional coercion designed to overbear Ephron's ability to make a knowing and voluntary statement.

The Government's evidence suffices to demonstrate by a preponderance of the evidence that Ephron's statements at the precinct were voluntary, and accordingly the statements will not be suppressed.

### D.  Even if *Edwards* Applied, Physical Evidence Would Not Be Excluded Under *Patane*

Finally, even if Ephron's interview at the precinct had been barred by *Edwards* or made in violation of *Miranda* (arguments that, for the reasons explained above, the Court has rejected), the contents of the cellphone itself should not be suppressed so long as the statements were voluntary.  Rather, all that would be suppressed regarding the cellphone is, at most, the passcode itself and offering evidence that Ephron knew the passcode and had provided it.  "Admission of

---

[10] Of course, the officers had a warrant to search Ephron's phone and did not need his consent to examine the phone within the limits of the Warrant.

nontestimonial physical fruits [of statements obtained in violation of *Miranda*] does not run the risk of admitting into trial an accused's coerced incriminating statements against himself." *United States v. Patane,* 542 U.S. 630, 645 (2004) (Kennedy, J., concurring in the judgment).

This does not mean that the provision of a passcode is not "testimonial," nor that the interaction with Ephron over his cellphone passcode is properly characterized as a request for consent to search.  It only means that, if there is a failure to give effective *Miranda* warnings when required, or if there is an *Edwards* violation, but the statement itself (here, the provision of the passcode) is made voluntarily, then the statement is suppressed but physical evidence recovered as a result of the statement is not.  *Patane*, 542 U.S. at 639-40.

The Court need not address at any length the Government's "good faith" argument regarding the passcode.  If it applies at all in this situation, it would produce the same outcome as the rule of *Patane*—if Ephron's testimonial statement of his passcode was voluntary, but was obtained in violation of the prophylactic rule of *Edwards*, then the statement would be suppressed but the contents of the cellphone would not be.  The defense reply attempts to characterize this argument as a claim that the exclusionary rule does not apply to the fruits of statements obtained in violation of the Fifth Amendment.  Reply Br. at 17.  That is not quite correct.  The Fifth Amendment protects against compelled statements being offered in evidence in a criminal trial.  The good faith argument only can salvage the fruits of *voluntary* statements, in the face of potential violations of the court-made prophylactic rules designed to vitiate Fifth Amendment rights.  It does not apply to violations of the Fifth Amendment rights themselves, in the form of compelled or involuntary statements.  Here, the Court has already found that Ephron's provision of his passcode was voluntary and was not acquired in violation of *Edwards* or of *Miranda*.  The rule of *Patane* backstops the search of the cellphone using that passcode

only if an appellate court disagrees with the Court's *Edwards* and *Miranda* analysis but agrees with the Court's conclusion that the statement was nonetheless voluntary.

### E.  The Court Declines to Reach Inevitable Discovery Without an Evidentiary Hearing

The Government also argues, based on a declaration from TFO Matthew Tunney, Gov't Opp. Exh. 6, that the principle of inevitable discovery would defeat suppression of the contents of the cellphone even if Ephron's statement of his passcode were suppressed.  Because the motion to suppress is denied and because defense counsel has indicated that they would like an evidentiary hearing before any ruling on inevitable discovery, the Court declines to reach this argument.  If the Government would like to seek a ruling on inevitable discovery despite the balance of this opinion, counsel should notify the Court to request an evidentiary hearing within seven days of the date of this opinion.

### CONCLUSION

For all of the reasons set forth above, the Defendant's motions are DENIED.  Trial remains set to begin on March 31, 2025.

Dated: February 18, 2025
New York, New York

SO ORDERED.

MARGARET M. GARNETT
United States District Judge