

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

---

*United States Attorney's Office*
*26 Federal Plaza*
*New York, New York 10278*

October 10, 2025

**BY ECF/EMAIL**

The Honorable Margaret M. Garnett
United States District Court
Southern District of New York
40 Foley Street
New York, New York 10007

    Re:    *United States v. Shymell Ephron*, S2 24 Cr. 418 (MMG)

Dear Judge Garnett:

    A unanimous jury concluded that Shymell Ephron knowingly and willfully raped two teenage runaways, plied them with drugs, and sold drugs to numerous others. Ephron committed these crimes mere months after being released from a long prison sentence for two violent robberies. Ephron is unrepentant and remorseless for this conduct. Instead, he blames his teenage victims for putting themselves in a position to be raped by him and the Government for charging him with the federal crimes he committed. Ephron also tries to turn the Court's focus away from his crimes and criminal history by regurgitating a version of the facts of this case that the jury rejected at trial and offering a one-sided view of his personal characteristics that he has fought hard to insulate from any scrutiny.

    Those tactics should not distract the Court from the consistent story of this case: Ephron repeatedly traumatized two teenagers with sexual violence, and he has proven conclusively through criminal conduct that spans over a decade that he is an extreme and persistent danger to society. On that record, a Guidelines sentence of no less than 600 months' imprisonment followed by a lifetime term of supervised release would be sufficient, but not greater than necessary, to reflect the seriousness of Ephron's conduct, to protect the public from Ephron's further crimes, to promote respect for the law, to ensure adequate deterrence, and to avoid unwarranted sentencing disparities.

**A.    Background**

    **1.  Ephron's Criminal History**

    Ephron has an unbroken history of escalating criminal conduct. His crimes began with a first-degree robbery that he committed at the age of thirteen. PSR ¶ 61. In 2011, at the age of twenty-one, Ephron threatened to kill a woman in the lobby of her building. About one month later, during his arrest for making that threat, Ephron became violent with police officers, flailing

his arms, kicking his legs, and grabbing onto a fence. Ephron eventually pled guilty to second-degree assault for striking the police officers, and he was sentenced to one year's imprisonment. PSR ¶ 63.

Ephron's most serious criminal convictions prior to this case came a few years later. On March 3, 2015, Ephron and a co-defendant committed an armed robbery of a marijuana dealer, during which two victims were shot. PSR ¶ 64; Exs. 1, 2. A few weeks later, despite the violence of the March robbery, Ephron committed another robbery by force. PSR ¶ 65; Ex. 2. Ephron eventually pled guilty to both robberies and was sentenced to ten years' imprisonment and five years' post-release supervision for the March armed robbery and two-to-four years' imprisonment for the August robbery. PSR ¶¶ 64-65.

During the nearly nine years he spent in state prison for those robbery convictions, Ephron repeatedly, and violently, violated prison rules. Ephron was cited for violent conduct and fighting on four separate occasions, resulting in, among other punishments, a cumulative total of eighty-one days of keeplock, *i.e.*, confinement in his cell. Ephron also repeatedly created disturbances, disobeyed direct orders, and otherwise interfered with the administration of the prison. PSR ¶ 64.

Ephron was paroled on November 16, 2023, and within months of his release, he began committing crimes again. On April 12, 2024, Ephron punched a romantic partner ("V") in the face and was later convicted second-degree harassment. PSR ¶ 66; Ex. 3.[1] Ephron was arrested two more times on robbery charges. PSR ¶¶ 74-75. Ephron also began selling powder cocaine, crack cocaine, marijuana, crystal methamphetamine, methamphetamine pills, and psychedelic mushrooms. PSR ¶ 23. And in May 2024—just six months after his release from state custody—Ephron began sexually preying on two runaway girls from Westchester County. PSR ¶ 13.

**2. The Offense Conduct**

Ephron first met the minor victims on May 17, 2024, in Times Square, while he and others were selling methamphetamine marketed as ecstasy. PSR ¶ 13. The Times Square area was where Ephron typically sold drugs after his most recent prison term, although at times he coordinated with customers and suppliers by phone and would arrange delivery or pick up of drugs at other locations. PSR ¶¶ 13, 23. For example, earlier on May 17, Ephron purchased 1000 methamphetamine pills from a supplier elsewhere in New York City with the intent to distribute those pills to others. PSR ¶ 24. Times Square was also where Ephron reported to parole. *See* GX 5, at USAO_000624.

---

[1] This was not the first time Ephron had punched V, who met with investigators last year. Ephron met V during his extended term in state prison and began a romantic relationship with her. After a few months, the relationship descended into a cycle of domestic violence. Ephron once knocked V out with a punch in the courtyard. On several other occasions, Ephron beat V in the prison gym with open and closed fists, called her names, and misgendered her. Another inmate once tried to stop Ephron from attacking V in the gym, so Ephron turned his attention to that inmate and started striking him instead.

Ephron noticed the minor victims before they saw him. The minor victims, who had run away from home several days earlier, were running through Times Square, trying to avoid someone they believed to be a detective. Tr. 190:4-5. Ephron saw Minor Victim-1 and called out to her, "girl in the pink shirt." Tr. 190:14-18. That comment drew Minor Victim-1 in, and she walked over to speak with Ephron. Tr. 190:2-6. On the sidewalk, the minor victims told Ephron and his friend, "Ape," that they had recently run away from their homes and had no phones or place to stay. PSR ¶ 13. At the time, Minor Victim-1 was fifteen years old, and Minor Victim-2 was seventeen years old. PSR ¶ 13.

Ephron invited the minor victims to his apartment in Harlem. PSR ¶ 13. On the subway ride there, Ephron flirted with Minor Victim-1. Ephron told Minor Victim-1 that he was twenty-seven, when he in fact was thirty-four, and asked Minor Victim-1, among other things, "how do you suck dick with braces." Tr. 194:4; *see* PSR ¶ 13.

When they reached Ephron's apartment, Ephron and Ape encouraged the minor victims to inflate an air mattress in the living room of the apartment, while Ephron went back to his bedroom. PSR ¶ 14. Ephron then called the minor victims into the bedroom where he had laid out two methamphetamine pills on the bed. PSR ¶ 14. Ephron told the minor victims that the pills were ecstasy pills and encouraged the girls to take the pills, which they did. PSR ¶ 14. Ephron also provided the minor victims with alcohol, which they drank. PSR ¶ 14.

Ape and Minor Victim-2 went to the living room together, leaving Minor Victim-1 and Ephron alone in the bedroom. PSR ¶ 15. Ephron kissed Minor Victim-1, took off her clothing and bra, and had sex with her without a condom. PSR ¶ 15; Tr. 198:4-16. Ape, meanwhile, raped Minor Victim-2 in the living room. PSR ¶ 15. After Ape left, Minor Victim-2 went to the bathroom to take a shower and told Minor Victim-1 and Ephron that Ape had forced her to have sex with him against her will. PSR ¶ 15. As Minor Victim-2 was describing the interaction, Ephron used his cellphone to record a video of the minor victims in the bathroom. PSR ¶ 15; GX 402C. Ephron sent the video to another friend and sent the friend multiple messages encouraging him to come to the apartment and to have sex with Minor Victim-2. PSR ¶ 15; GX 402, 402C.

Later that night, the minor victims and Ephron laid down on Ephron's bed to go to sleep. PSR ¶ 16. After Minor Victim-1 fell asleep, Ephron directed Minor Victim-2 to go to the kitchen to wash dishes, which she did. PSR ¶ 16. Ephron followed Minor Victim-2 to the kitchen. PSR ¶ 16.

In the kitchen, Ephron cornered Minor Victim-2 and opened the freezer door, blocking the view into the kitchen from the bedroom, where Minor Victim-1 was asleep. PSR ¶ 16. Ephron then raped Minor Victim-2 on the kitchen floor. PSR ¶ 16. As Minor Victim-2 described it at trial, Ephron "put his [h]and around my neck and he … pushed me down. And I was … on my knees." Tr. 753:22-23. Minor Victim-2 told Ephron to stop, said she did not want to have sex with him, and explained that he already had sex with Minor Victim-1. PSR ¶ 16; Tr. 754:1-11. Ephron did not listen. When Minor Victim-2 was on her knees, Ephron placed his hands on her back and waist. Tr. 754:20-755:1. As Minor Victim-2 described at trial, Ephron then "pulled my pants down halfway and he tried to put it in and did. And he didn't stop until he finished." Tr. 753:23-25. Ephron told Minor Victim-2 "to not tell [Minor Victim-1] anything, and to not even bring it up to her or mention it." Tr. 755:12-13. After Ephron ejaculated, Minor Victim-2 went to the bathroom

to clean herself off. She considered leaving, but she did not want to abandon her friend. Tr. 755:18-756:6.

For the next five days, the minor victims stayed with Ephron at his apartment. PSR ¶ 17. Each day, Ephron provided the minor victims with methamphetamine in the form of counterfeit ecstasy pills, and he sometimes encouraged them to take multiple pills in one day. PSR ¶¶ 13, 14, 17. Ephron also gave the minor victims alcohol and marijuana repeatedly over the course of their time with him. PSR ¶ 17. Ephron clearly favored Minor Victim-1 over Minor Victim-2, giving Minor Victim-1 gifts, including "a pair of Jordans." Tr. 235:4-8. Meanwhile, Ephron made Minor Victim-2 clean, cook, and do housework. Tr. 235:9-17. When Minor Victim-1 tried to help Minor Victim-2 with the housework, Ephron became angry. Tr. 235:19-22.

Ephron gave the minor victims a cellphone to use when they left his apartment. PSR ¶ 18. Ephron frequently contacted the minor victims on this phone when they were out to tell them when to come back to his apartment. PSR ¶ 18. Ephron instructed the minor victims to use the cellphone only to contact him, prohibiting them from using it to contact anyone else. PSR ¶ 18.

For five days, until they were found by the FBI, Ephron raped both minor victims repeatedly. PSR ¶ 19. Ephron had sex with the fifteen-year-old Minor Victim-1 every night she stayed at his apartment and, often, each afternoon when she woke up. PSR ¶ 19. Ephron had sex with Minor Victim-1 in the bedroom, the living room, and the bathroom of his apartment, always without a condom. Tr. 231:6-13. Ephron also performed manual and oral sex acts on Minor Victim-1. Tr. 231:14-19. Once, Ephron started having sex with Minor Victim-1 while she was asleep. PSR ¶ 19.

When Minor Victim-1 was asleep, Ephron forcibly raped Minor Victim-2 multiple times. PSR ¶ 20. Each time Ephron had sex with Minor Victim-2, he did so without her consent, holding her down from behind while having sex with her in the kitchen. PSR ¶ 20. Minor Victim-2 told Ephron to stop and attempted to fight him off, but she was unable to stop Ephron, who was much older and physically bigger than she was, from raping her. PSR ¶ 20.[2] Ephron repeatedly told Minor Victim-2 not to tell Minor Victim-1 about the rapes. PSR ¶ 20.

Ephron also verbally and physically abused Minor Victim-2 in other ways. One night, after the minor victims came back to the apartment, Ephron was mad at the girls, so he went into the living room to sleep on the air mattress by himself. PSR ¶ 21. Minor Victim-2 walked out into the living room and asked Ephron why he was acting that way, leaving Minor Victim-1 alone in the bedroom with the music on. PSR ¶ 21. During that conversation, Ephron tried to put his hands down Minor Victim-2's pants but was initially unsuccessful, and Minor Victim-2 was able "to take out his hand." Tr. 762:11; *see* PSR ¶ 21. Ephron then tried again to put his hand down Minor Victim-2's pants over her objection. PSR ¶ 21. This time, Ephron successfully forced his hand into Minor Victim-2's pants and underwear. PSR ¶ 21. Ephron put his fingers inside of Minor Victim-2's vagina without her consent. PSR ¶ 21. As Minor Victim-2 described, "[A]fter he put

---

[2] The defense contests this and other facts in the PSR. *See* Def. Mem. App. A. For the reasons set forth in the Government's response, attached as Exhibit 4, the defense's objections are meritless and should be overruled.

his hand in my pants and … [took] it out," "he smelled it." Tr. 763:2-3. While smelling his fingers, Ephron accused Minor Victim-2 of "being outside," meaning "sleeping with everyone." Tr. 762:15-20.

The last night the minor victims stayed with Ephron, he left them alone in the apartment for a while. Tr. 766:20-21. The shoe rack in Ephron's bedroom broke while the minor victims were in the kitchen. Tr. 767:4-16. This worried Minor Victim-2, because she "didn't know how [Ephron] was going to react" to the news of the broken shoe rack. Tr. 768:1-2. When Ephron came home later, Minor Victim-2 told him about the broken shoe rack because she did not want him to think that she had "touched his stuff." Tr. 768:6-7. Ephron grew angry and started accusing Minor Victim-2 of "trying to look through his stuff." Tr. 768:11-12; *see* Tr. 234:19. When Minor Victim-2 denied doing so, Ephron accused her of lying. Tr. 769:1-2.

The shoe rack incident led to an argument between Ephron and the minor victims. PSR ¶ 22. The minor victims left Ephron's apartment and walked to a nearby NYPD precinct. PSR ¶ 22. While the girls were walking to the police station, Ephron texted them on the cellphone he had given them and told them to come back to his apartment. PSR ¶ 22. When they did not immediately return, Ephron followed the minor victims to the precinct and convinced them to leave with him before they could have a substantive conversation with a police officer. PSR ¶ 22.

Later that night, at the apartment, Ephron again raped Minor Victim-2, this time using the threat of force. PSR ¶ 22. Once more, Ephron put the blanket down in the kitchen. Tr. 777:16-24. He then had sex with Minor Victim-2 without her consent. Tr. 773:25-774:2. This time, however, Minor Victim-2 did not resist, because, in her words, "it was to the point where I gave up." Tr. 774:6.

The next morning, Ephron again had sex with Minor Victim-1. PSR ¶ 22. Shortly thereafter, Ephron gave the minor victims more methamphetamine and marijuana, and the girls went out for the day. Tr. 243:16-244:1. As the minor victims were exiting Ephron's apartment building, the FBI found them and brought them home. PSR ¶ 22.

**B.     The Guidelines Range**

The Presentence Investigation Report prepared by the U.S. Probation Office ("Probation") accurately sets forth the sentencing range under the U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines"). Ephron's offense level for the enticement of Minor Victim-1 is thirty-six, his offense level for the enticement of Minor Victim-2 is thirty-eight, and his offense level for the narcotics offenses is twenty-eight. PSR ¶¶ 34-52. After grouping, the combined offense level is forty. Ephron receives no reduction for acceptance of responsibility. PSR ¶¶ 53-60.

Ephron is a career offender because he has two prior robbery convictions in New York state court, as detailed above, and he was convicted of controlled substances offenses in this case. PSR ¶¶ 57, 64-65, 68. Accordingly, Ephron is in Criminal History Category VI. PSR ¶ 68. The Guidelines sentencing range is 360 months' to life imprisonment, with two mandatory minimum terms of 120 months' imprisonment that may run concurrently. PSR ¶ 116.

The defense raises one objection to Probation's Guidelines calculation: that the two-point "vulnerable victim" enhancement should not apply. Def. Mem. 8-9. That argument does not make a difference. *See United States v. Borrego*, 388 F.3d 66, 70 (2d Cir. 2004) (a "court is not obliged to waste its time making [Guidelines] findings that would have no effect on the sentence"); *United States v. Tracy*, 12 F.3d 1186, 1203 (2d Cir. 1993) (when a sentencing dispute has no bearing on the determination of a sentence, courts need not rule on disputed offense level adjustments). Without the two-point victim enhancement, Ephron's combined offense level would drop to thirty-eight. Because Ephron is in Criminal History Category VI, his sentencing range with an offense level of thirty-eight would still be 360 months' to life imprisonment.[3]

The defense's objection to the "vulnerable victim" enhancement is also meritless. The enhancement applies whenever a victim "is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1 app. note 2. The minor victims, who because of their circumstances "had difficulty recognizing abuse" or stopping the abuse, plainly meet that definition. *United States v. Hadden*, 2024 WL 4456203, at *5 (2d Cir. Oct. 10, 2024).

The minor victims told Ephron when they first met him that they had run away from home, had no money, no phones, and no place to stay. PSR ¶ 13. Their young age and lack of immediate access to any help was plain on their faces, in the clothes they wore, and in the bags they carried. Ephron's immediate reaction to meeting the girls was to lure them to himself, bring them back to his apartment, give them drugs, and target them for sex. *See* PSR ¶¶ 13-16. For days thereafter, Ephron kept the minor victims high on methamphetamine. PSR ¶ 17. While Minor Victim-1 slept, recovering from a cycle of heavy drug use and sex, Ephron further preyed on her and once even had sex with her while she slept. PSR ¶ 19.

Ephron's targeting of Minor Victim-2's vulnerabilities was worse. Within a couple hours of meeting her, Ephron learned that his friend had raped Minor Victim-2, which Minor Victim-2 disclosed to Ephron directly in the bathroom. Ephron used his knowledge of how Minor Victim-2 reacted to the assault to prey on her. He took a video in the bathroom while Minor Victim-2 showered and messaged *another* friend to come over and have sex with Minor Victim-2, ignoring the trauma of what she had just experienced. PSR ¶ 16. When the friend never arrived, Ephron decided to assault Minor Victim-2 himself. PSR ¶ 17. Ephron repeated his attacks on Minor Victim-2 over the course of days, counting on her reluctance to stop him or to say anything to continue his pattern of rape.

Finally, when the minor victims tried to leave for good, Ephron exploited their vulnerabilities—their lack of a place to stay, their inability to contact Minor Victim-2's mother,

---

[3] The defense also asks the Court to disregard the career offender provisions of the Guidelines as a matter of discretion under 18 U.S.C. § 3553(a), although they do not contest that those provisions apply to Ephron. Def. Mem. 9-10. This argument is also irrelevant. Without the career offender provisions, Ephron would be in Criminal History Category IV. PSR ¶¶ 67-68. At the correct offense level of forty and Ephron's preferred Criminal History Category IV, the Guidelines range would still be 360 months' to life imprisonment.

and their reliance on Ephron—to get them to come back to his apartment, where he assaulted them both again. *See* PSR ¶ 22.

**C.    Applicable Law**

    **1.   The Sentencing Guidelines and 18 U.S.C. § 3553(a) Factors**

The Sentencing Guidelines continue to provide important guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Though they are advisory and not mandatory, the Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall v. United States*, 552 U.S. 38, 46 (2007). It follows that district courts should treat the Sentencing Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49; *see also Booker*, 543 U.S. at 264 (explaining that district courts must "consult" the Sentencing Guidelines and "take them into account" when sentencing). Accordingly, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall*, 552 U.S. at 49.

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

    **2.   Standard for Factual Findings**

Facts relied on at sentencing for the purpose of calculating the applicable Sentencing Guidelines must be established by a preponderance of the evidence. *United States v. Thorn*, 317 F.3d 107, 117 (2d Cir. 2003); *United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005).

Furthermore, "a sentencing court, like a jury, may base its fact-finding on circumstantial evidence and on reasonable inferences drawn therefrom." *United States v. Gaskin*, 364 F.3d 438, 464 (2d Cir. 2004).

As always, the "sentencing court is afforded broad discretion in resolving disputed factual issues." *United States v. Ambrosio*, 129 F.3d 114, 1997 WL 701368, at *2, n.1 (2d Cir. 1997) (summary order) (citing *United States v. Ibanez*, 924 F.2d 427, 430 (2d Cir. 1991)). Indeed, the sentencing court "is entitled to rely on any type of information known to it" in resolving sentencing disputes. *United States v. Tracy*, 12 F.3d 1186, 1203 (2d Cir. 1993) (citing *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989)).

At a sentencing hearing, the Federal Rules of Evidence do not apply, and the Court is not bound by rules governing hearsay, provided the basis for the court's determination has indicia of reliability and is not otherwise contrary to a defendant's due process rights. *See United States v. Fatico*, 579 F.2d 707, 711 (2d Cir. 1978); *see also United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005) ("Both the Supreme Court and this Court, however, have consistently held that the right of confrontation does not apply to the sentencing context and does not prohibit the consideration of hearsay testimony in sentencing proceedings."). Rather, "[a]ny information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination." *Carmona*, 873 F.2d at 574 (citing *Williams v. New York*, 337 U.S. 241, 250-51 (1949)).

**D.   A Guidelines Sentence of at Least 600 Months' Imprisonment Followed by A Lifetime Term of Supervised Release Is Appropriate and Necessary**

The Government respectfully submits that a sentence of at least 600 months' imprisonment followed by a lifetime term of supervised release is sufficient, but not greater than necessary, to achieve the legitimate purposes of sentencing. Such a sentence is necessary to reflect the seriousness of Ephron's conduct, to protect the public, to promote respect for the law, to ensure adequate deterrence, and to avoid unwarranted sentencing disparities.

   **1.   The Nature and Seriousness of Ephron's Offenses and the Need to Provide Just Punishment Support the Government's Recommended Sentence**

A sentence of 600 months' imprisonment or more is necessary to reflect the nature, circumstances, and seriousness of the offenses and to provide just punishment. Ephron's conduct in this case was about as serious as it gets. He encountered two runaway girls aged fifteen and seventeen in Times Square, and he preyed on them. Instead of encouraging the girls to return home to their parents, Ephron brought the girls to his apartment and gave them drugs and alcohol. Ephron romantically pursued the fifteen-year-old runaway from the moment he called out to her on the street. He gave her gifts, food, and shelter. Ephron also gave her methamphetamine on a daily basis and convinced her that they were in a romantic relationship. Through that conduct, Ephron was able to exploit the fifteen-year-old girl's youth and inexperience with drugs like methamphetamine, and he was able to have sex with her repeatedly without a condom in his bedroom, bathroom, and living room, just as he wanted from the beginning.

Ephron also forcibly raped the seventeen-year-old runway repeatedly, over multiple days. At first the seventeen-year-old girl resisted Ephron's advances, said no, and fought back. But Ephron, who is far larger and stronger, overcame her will and forced himself upon her. After several days of forcing her to have sex when she said no, Ephron broke the seventeen-year-old girl's will, and she gave up trying to resist him.

The impact of Ephron's abuse on the minor victims will last a lifetime. As Minor Victim-1's mother writes in her letter to the Court, Minor Victim-1 has always been a bright, spirited girl who loves her family, even if, like many adolescents, she has had her struggles finding her place. When the FBI found Minor Victim-1 after she spent several days at Ephron's apartment, she was unrecognizable. Minor Victim-1 was wearing Ephron's shorts and the sneakers Ephron gave her. Minor Victim-1 had lost weight, her pupils were dilated, her jaw was clenched, and her gaze was vacant.



The minor victims' injuries only worsened during and after the trial. Minor Victim-2 describes in her letter how difficult it was to see Ephron, the man who raped her, in person again and to have to tell her mom and the jury what it was like to be abused by him. Minor Victim-2 could barely eat during trial, and in the evening between her two days of testimony, Minor Victim-2 threw up multiple times. But Minor Victim-2 gathered the strength the next morning to return to court to face her abuser because, as she writes, she "could not let him get away with it." Minor Victim-2 then endured painful questioning, including times when the defense blamed her for being raped and asked her to recite the names that her bullies used to taunt her. Tr. 891:19-20; 893:21; 943:10-14.

Ephron has not taken responsibility or expressed remorse for any of this heinous conduct. But Ephron's refusal to acknowledge the pain he inflicted on the minor victims and their families does not make that pain any less real or substantial. The victims will have to live with the impact of Ephron's conduct for decades. The Court should ensure that he lives with the consequences of his actions for just as long.

The defense tries to minimize Ephron's reprehensible conduct by falsely describing the trial evidence and seizing on irrelevant distinctions to distract from the seriousness of Ephron's crimes. Def. Mem. 13-15. Many of the defense's claims on this score do not require a response,

but for example: Despite the defense's claims, there was plenty of evidence that Ephron acted as a "pedophile [and] sexual predator," Def. Mem. 13, when he lured runaway teenagers into his home with the promise of drugs and alcohol, commented on one of the teens' ability to perform oral sex with braces, and repeatedly forced another teenager to have sex with him against her will. It was Ephron who first yelled "girl in the pink shirt" to catch Minor Victim-1's attention, Tr. 190:14, not the minor victims who sought out Ephron, *see* Def. Mem. 14. It does not mitigate Ephron's conduct that he found the minor victims in Times Square rather than a playground. *See* Def. Mem. 13.[4] And the defense's suggestion that Ephron's conduct with respect to Minor Victim-2 was less horrific because she was "of age" as a seventeen-year-old, Def. Mem. 13, is grotesque—no one is "of age" to be forced onto the kitchen floor, have their underwear ripped aside despite their protestations, and penetrated against their will repeatedly.

The defense also continues to wage the same campaign of victim-blaming teenagers that the jury unanimously rejected, focusing on the minor victims' vulnerabilities before Ephron met them, including that the minor victims were runaways who needed a place to stay. Def. Mem. 13-15. But those facts are not mitigators—they are aggravators. Ephron raped the minor victims even though he knew how young and vulnerable they were. The minor victims told Ephron during their first conversation that they had run away from home and had no cellphone. Tr. 711:6-8. A couple days after Ephron invited the girls back to his apartment rather than counseling them to return home, Ephron and the minor victims watched the news coverage of the girls' disappearance together. *See* Tr. 237:4-24; GX 115. Ephron even knew that Minor Victim-2 had previously been the victim of forcible sexual assault, because she told him immediately about what Ape had done to her the first night they met. PSR ¶ 15. Ephron also exacerbated the minor victims' vulnerabilities by giving them methamphetamine disguised as ecstasy, among other drugs and alcohol, every day they stayed with him. As Minor Victim-2 described at trial, Ephron's methamphetamine affected the victims' ability to focus, caused them to break out, and made them sweat. Tr. 724:15-725:2. It is unsurprising that vulnerable young girls to whom Ephron had given addictive drugs and other gifts made the unwise and dangerous decision to spend several days with him or that one of those girls foolishly believed that she and Ephron were in a genuine romantic relationship. It is precisely because teenagers and children make such decisions that statutes like 18 U.S.C. § 2422(b) exist, to prohibit adults like Ephron from capitalizing on those decisions for their own sexual gratification.

The defense's mitigation argument about federal jurisdiction is yet another distraction. Def. Mem. 13-14. Their characterizations of the congressional intent underlying 18 U.S.C. § 2422(b) do not make Ephron any less culpable for drugging and raping teenagers, including one by force, or make Ephron any less of a danger to society. In any event, 18 U.S.C. § 2422(b) is regularly used to apprehend and punish predators like Ephron who initially meet their victims in person and then use cellphones, among other means, to facilitate later hands-on sexual abuse. *See, e.g., United States v. Paduch*, 2024 WL 3634739, at *1 (S.D.N.Y. Aug. 2, 2024) (doctor convicted of 18 U.S.C. § 2422(b) violations for abusing minor patients where the only telephone and Internet communications were regular prompts to schedule follow-up appointments); *United States v. Fox*,

---

[4] For whatever the defense's argument on this point is worth, the surveillance video that depicts Ephron selling drugs near teenagers in Times Square on July 3, 2024, shows that he did regularly spend time around minors in the area where he met the minor victims. *See* GX 113.

600 F. App'x 414, 418-19 (6th Cir. 2015) (conviction upheld when defendant who used text messages to compliment and meet the victim and only asked for sex in person); *see also* Dkt. 50, at 1-3, *United States v. Carazas-Pinez*, 23 Cr. 346 (JPC) (S.D.N.Y. June 28, 2025) (teacher abused student she initially met in person and used cellphones to facilitate abuse); Dkt. 127, at 4, *United States v. Concepcion*, 21 Cr. 479 (LAP) (S.D.N.Y. Sept. 4, 2024) (teacher abused students he met initially in person and used cellphones to arrange meetings for abuse).

  The defense's jurisdictional argument is also meaningless as a matter of practice. If Ephron had been convicted in state court of just *one* of his rapes of Minor Victim-2, his sentence would be among the highest that New York law allows. *Cf.* Def. Mem. 9-10, 15 (asking the Court to disregard the career offender Guidelines because they are unfairly "draconian"). In state court, Ephron's first-degree rape conviction in this case and his prior second-degree assault and first-degree robbery convictions would combine to classify him as a persistent violent felony offender. *See* N.Y. Penal Law § 70.08; *see also* N.Y. Penal Law §§ 70.02(1)(a), 70.02(1)(c), 70.04(1)(b). As a result, for one rape conviction alone, Ephron would face an indeterminate sentence with a maximum of life imprisonment and a mandatory minimum of between twenty and twenty-five years' imprisonment. *See* N.Y. Penal Law §§ 70.08(2), 70.08(3)(a-1); *see also* N.Y. Penal Law § 70.02(1)(a). Put differently, the fact that Ephron was prosecuted federally has *benefited* him at sentencing, as his mandatory minimum sentence in this Court is only 120 months' imprisonment.

  The defense's further argument that Ephron bears less responsibility for raping the minor victims because of his intellectual limitations rests on the untested assertions of Dr. Jason Krellman. Def. Mem. 10-16. It is impossible to know what to make of Dr. Krellman's analysis because, at every turn, the defense has resisted the Government's obtaining a second opinion from its own forensic psychologist. *See, e.g.*, Dkt. 144, at 1 (the defense withdrawing their Rule 12.2 notice minutes before the Government was due to receive a rebuttal expert's psychological analysis and requesting that the Court order the rebuttal expert to destroy his records).[5] That strategic choice has placed the Government in the "overwhelming[ly] difficult[]" position of trying to "respond[] to … defense psychiatric testimony without its own psychiatric examination of the accused," raising the substantial possibility of "fraudulent mental defenses." *Powell v. Texas*, 492 U.S. 380, 683-84 (1989). Indeed, even though the defense relied extensively on Dr. Krellman's analysis in their sentencing submission and appended his full report to their letter, as recently as October 6, 2025, the defense refused by email to consent to the Government's obtaining access to its own

---

[5] There is plenty of reason to doubt the defense's mental capacity arguments, given that they have previously relied on Dr. Krellman to offer false, or at best overbroad, descriptions of the impact of Ephron's intellectual capabilities. *See, e.g.*, Dkt. 96, at 27 n.9 (the Court recognizing "an unacknowledged tension" between the defense's sweeping assertions about Ephron's cognitive limitations and their argument that Ephron "asserted … his right to counsel"); Dkt. 56, at 7 (the Government describing the incongruity between the defense's theory that Ephron's "cognitive impairments" made him believe that he could speak to the FBI "without consequence" and the actual audio recording of Ephron's FBI interview, in which he fully appreciated the consequences of his statements and falsely denied any criminal conduct).

evaluation of Ephron.[6] In assessing the relevance and accuracy of Dr. Krellman's conclusions and the defense's arguments about those conclusions, the Court should consider the lengths to which the defense has gone to prevent anyone from ever questioning their work. For example, because they have refused to subject their psychological conclusions to scrutiny, the defense's arguments that the Court should ignore the trial evidence and instead conclude that Ephron is not a "strategic or calculating predator" and "simply not a sexual predator" based on Dr. Krellman's analysis, Def. Mem. 11, 16, are not credible. *Cf.* Dkt. 42, at 8, *United States v. Andrew Pettitt*, 09 Cr. 153 (LAP) (S.D.N.Y. Mar. 3, 2010) (arguing credibly that the defendant "does not suffer from a sexual disorder" because both a defense expert and a government expert reached that conclusion).

In any event, the defense's characterizations of Ephron's mental capacity do not excuse his conduct. It was not a foregone conclusion from Ephron's cognitive limitations that he would commit the egregious crimes in the case or the many violent crimes in his past. Many people experience similar limitations and live law-abiding lives. Ephron made choices to rape teenagers repeatedly and to give drugs to them and to others. Contrary to the defense's suggestion, Def. Mem. 11, Ephron demonstrated repeatedly throughout this case that he was and is fully capable of appreciating the illegality and wrongfulness of his decisions. Ephron knew what he was doing when, minutes after obtaining Minor Victim-1's attention on the sidewalk, he lied to her about his age and commented on her braces, followed shortly by giving Minor Victim-1 fake "e-pills" and having sex with her. No one tricked Ephron into doing any of that—he made the choice to call after Minor Victim-1 on his own because he wanted to have sex with a runaway teenager with braces. The defense's claims about Ephron's cognitive limitations, "gullibility," and "suggestibility," Def. Mem. 15, also cannot explain his violent rapes of Minor Victim-2. Ephron chose on his own to push Minor Victim-2 to the ground and have sex with her even though she told him "no." Tr. 754:6. And Ephron clearly appreciated the wrongfulness of that conduct because he told Minor Victim-2 not to tell Minor Victim-1 about how he had raped her.

Ephron also clearly appreciated the gravity of what he had done to the minor victims because he lied during the FBI interview on June 7, 2024. In that interview, Ephron repeatedly resisted what the defense has described as the FBI's "coercive" efforts to "pressure[]" him into making harmful confessions, Dkt. 45, at 10, 32, advanced a false exculpatory narrative about the minor victims, and negotiated a limited consent to search his cellphone solely for exculpatory information. *See, e.g.*, Dkt. 96, at 27-29 (describing Ephron's voluntary statements during the interview). A person who could interact with the FBI in the way that Ephron did certainly could choose not to rape a teenager when she says no and not to give methamphetamine to another

---

[6] The Government considered seeking authorization to access its expert's psychological analysis over the defense's objection, but several courts have expressed concerns about whether permitting the Government to access rebuttal expert reports in non-capital sentencings is consistent with Rule 12.2 of the Federal Rules of Criminal Procedure. *See, e.g.*, *United States v. Chudhary*, 2025 WL 2057807, at *3 (E.D.N.Y. July 23, 2025); *United States v. Encarnacion*, 2020 WL 3051336, at *3 (S.D.N.Y. June 8, 2020). Although the Government does not agree with those decisions, it is unnecessary to adjudicate those issues in this case. From the Government's perspective, it is sufficient that the Court be made aware the inherent unreliability of the defense's purposefully one-sided presentation Ephron's mental capacity.

teenager who had run away from home and then have sex with her, too. But Ephron chose to do those horrific things. The Court's sentence should reflect those choices.

### 2. The Government's Recommended Sentence Is Necessary to Protect the Public, Afford Adequate Deterrence, and Promote Respect for the Law

A sentence of at least 600 months' imprisonment followed by a lifetime term of supervised release is necessary to protect the public, afford specific deterrence, and promote respect for the law. The defense spends precious little time on the incapacitation and deterrence concerns in this case. *See* Def. Mem. 16. In the Government's view, those considerations are paramount.

There is perhaps no clearer case for a multi-decade sentence to protect the public than this one. Ephron is an extreme danger the community. He is a career offender in both the legal and colloquial sense. He has now been convicted of multiple violent offenses, including multiple rapes, drug dealing, two robberies, an assault, and a harassment charge that stems from another assault. Even years in prison hardly stopped Ephron from inflicting further pain, as his record in state custody is marred with multiple instances of fighting, violence, and disobedience. Ephron's nearly unabated string of violent and destructive conduct from at least 2015 to 2024 has left two people shot, at least one romantic partner with facial injuries, other inmates damaged, and two teenage girls with the lifelong trauma of sexual abuse.

Ephron committed his most recent and serious crimes at a time when one would expect him to be on his best behavior. When Ephron was released from state custody in November 2023, he was a thirty-four-year-old man who had been in prison for nearly nine years. He was mature. He was experienced with law enforcement. And he knew the serious consequences of criminal conduct and the pain that such conduct inflicts on others.

Yet Ephron started committing serious felonies almost immediately. Ephron began selling drugs (including in Times Square, near where he had parole meetings) mere months after his release from state custody. He punched his romantic partner five months after his release. And he raped the two minor victims in this case just six months after he was released. In total, Ephron could not last eight months at liberty without committing a string of crimes that injured multiple people and spread poison in our community. And worse yet—Ephron is not apologetic for the pain he inflicted in that short time. There is every reason to believe that Ephron will again engage in unabashed violence whenever he is released. The Court should mitigate the fallout from that conduct with an extended term of imprisonment.

Nothing about Ephron's personal characteristics, his criminal history, or his conduct in this case leads to any conclusion other than Ephron is a violent, serial predator. Ephron had every opportunity to stop this pattern of violence and crime. That he has not done so means than he is unwilling to stop. The Court should, of course, consider the aim of deterring Ephron from committing more violent assaults in the future when it imposes sentence. To the extent that deterrence is possible here, given that Ephron was already sentenced to a ten-year prison term in 2016, a sentence of at least 600 months' imprisonment would be necessary to prevent his future crimes. But the Government acknowledges that even its requested sentence may yet again fail to stop Ephron from committing more violence. The best predictor of Ephron's future comes from

looking at his past, and so far, Ephron has shown that nothing other than his incapacitation can protect society.

Ephron's criminal past and the danger he presents to society naturally lead to the conclusion that he should spend the rest of his life in prison. A life sentence here would be reasonable and justified. In addition to being a just punishment for his crimes, such a sentence would ensure the safety of others and recognize the failure of prior attempts at deterrence. The Government has indicated that a sentence of at least 600 months would also be reasonable only in recognition of the defense's mitigation arguments regarding Ephron's upbringing and disability diagnoses in childhood, which the Government has no reason to doubt. *See* Def. Mem. 2-5. If the Court is inclined to impose a sentence of imprisonment measured in a term of years rather than life, the Government respectfully recommends that it also impose a lifetime term of supervised release to attempt to mitigate the damage that Ephron may cause in the future.

### 3. The Government's Recommended Sentence Avoids Unwarranted Sentencing Disparities

A sentence of at least 600 months' imprisonment and a lifetime term of supervised release is necessary to avoid unwarranted sentencing disparities. It is not as hard as the defense claims to find sentences analogous to this case. In fact, as described below, sentences for 18 U.S.C. § 2422(b) convictions are often within the Guidelines range applicable here—and that is true even when the defendant is not a career offender who fails to take responsibility for repeatedly forcibly raping a minor and having sex with, and providing methamphetamine to, another minor less than a year after being released from ten-year prison term for armed robbery, as Ephron is:

- In *United States v. Leland Robinson*, 20 Cr. 448 (KMK), a jury convicted the defendant of one violation of 18 U.S.C. § 2422(b). Robinson convinced a fourteen-year-old to have sex with him once in exchange for an electronic cigarette and attempted unsuccessfully to have sex with two other teenagers. This case did not involve forcible compulsion, and Robinson had no criminal history. Judge Karas sentenced Robinson to 600 months' imprisonment followed by fifteen years' supervised release.

- In *United States v. Paduch*, 23 Cr. 181 (RA), a jury convicted the defendant of multiple violations of 18 U.S.C. §§ 2422(b) and 2422(a). Paduch was a doctor who sexually abused his patients, some of whom were teenagers. This case did not involve forcible compulsion, and the defendant was in Criminal History Category I. Judge Abrams sentenced the defendant to life imprisonment.

- In *United States v. Wilfredo Rosado*, 21 Cr. 316 (RMB), a jury convicted the defendant of violations of 18 U.S.C. §§ 2251(a) and 2252(a)(2)(B) and acquitted him of violations of 18 U.S.C §§ 2422(b) and 1201. Rosado psychologically manipulated a seventeen-year-old girl for fifteen months and raped her during a five-day stay at a hotel in the Bronx. Judge Berman sentenced the defendant to 360 months' imprisonment followed by twelve years' supervised release.

- In *United States v. Jesus Concepcion*, 21 Cr. 479 (LAP), the defendant pled guilty on the eve of trial to multiple violations of 18 U.S.C. §§ 2422(b), 2423(a), and 2423(b). Concepcion was a teacher who abused five girls between the ages of twelve and sixteen, convincing them to have sex by providing them with gifts and attention. Although Concepcion threatened one victim to prevent her from disclosing the abuse, the case did not involve sex by forcible compulsion, and the defendant was in Criminal History Category I. Judge Preska sentenced the defendant to 360 months' imprisonment followed by ten years' supervised release.

- In *United States v. Sandy Carazas-Pinez*, 23 Cr. 346 (JPC), the defendant pled guilty to one violation of 18 U.S.C. § 2422(b). Carazas-Pinez was a teacher who abused her sixteen-year-old student. This case involved some threats by the defendant to commit self-harm and to give the victim low marks in school, but it did not involve forcible compulsion, and the defendant was in Criminal History Category I. Judge Cronan sentenced the defendant to 300 months' imprisonment followed by five years' supervised release.

- In *United States v. Marcelo Marin Vargas*, 21 Cr. 568 (CS), the defendant pled guilty to three violations of 18 U.S.C. § 2422(b). Vargas had graphic sexual conversations with multiple minors over the internet and encouraged them to send him sexually explicit images. This case did not involve forcible compulsion, and the defendant was in Criminal History Category I. Judge Seibel sentenced the defendant to 240 months' imprisonment followed by a lifetime term of supervised release.

- In *United States v. Jonathan Weiss*, 21 Cr. 449 (PMH), the defendant pled guilty to multiple violations of 18 U.S.C. § 2422(b). Weiss also engaged in graphic sexual conversations with multiple minors over the internet. This case did not involve forcible compulsion, and the defendant was in Criminal History Category I. Judge Halpern sentenced the defendant to 300 months' imprisonment followed by 300 months' supervised release.

By contrast, none of the cases the defense cites provides meaningful guidance here. Def. Mem. 17-19. The defense does not rely on a single case involving any of Ephron's crimes of conviction: enticement of a minor under 18 U.S.C. § 2422(b), narcotics distribution conspiracy under 21 U.S.C. § 846, and distributing drugs to minors under 21 U.S.C. § 859(a). In all but one of the cases that the defense cites, the defendants pled guilty to, and took responsibility for, their conduct, whereas Ephron has steadfastly denied responsibility for his conduct, heightening the need for incapacitation and deterrence and resulting in a painful and retraumatizing trial for the minor victims. The cases Ephron cites also lack many of the other obvious aggravating factors that make Ephron's case so serious, including the repeated use of forcible compulsion to require a minor to have sex with him, the provision of methamphetamine to the minor victims prior to sex, Ephron's career offender criminal history, the fact that the crimes here occurred mere months after Ephron's release from a ten-year prison term for a violent robbery, and the high applicable Guidelines range of 360 months' to life imprisonment. *See, e.g.*, *United States v. Fabrice Tontisabo*, 21 Cr. 701 (LAK) (no sex by forcible compulsion and the defendant was in Criminal

History Category I); *United States v. Michael Paschal*, 21 Cr. 331 (VSB) (no sex by forcible compulsion, the defendant was in Criminal History Category I, and much lower Guidelines range); *United States v. Denver McFadden*, 17 Cr. 463 (LAK) (no sex by forcible compulsion, the defendant was in Criminal History Category I, and the defendant was sixty-eight years old at sentencing); *United States v. William Hemming*, 15 Cr. 540 (GHW) (no sex by forcible compulsion and much lower Guidelines range); *United States v. Rasheed Davis*, 10 Cr. 432 (NRB) (much lower Guidelines range); *United States v. Andrew Pettitt*, 09 Cr. 153 (LAP) (no sex by forcible compulsion, the defendant was in Criminal History Category I, and the offense triggered much lower Guidelines).[7] None of the defense's cases adequately supports their extraordinary request for a 240-month downward variance or undermines the Government's reasonable recommendation of a Guidelines sentence.



---

[7] In their strain to distinguish Ephron from other 18 U.S.C. § 2422(b) defendants, the defense continues to mischaracterize the jury's verdict, falsely claiming that this case "lacks aggravating factors" like "physical assaults or threats of violence." Def. Mem. 17. To the contrary, this case involves the unanimous verdict of twelve jurors that Ephron repeatedly obtained sex from a minor by force and that Ephron plied both minors he raped with methamphetamine for days.

E.  **18 U.S.C. § 3014, Restitution, and Forfeiture**

18 U.S.C. § 3014(a)(4) formerly provided that "the court shall assess an amount of $5000 on any non-indigent person or entity convicted of an offense under ... chapter 117 (relating to transportation for illegal sexual activity and related crimes)," which includes 18 U.S.C. § 2422. This statute expired on September 30, 2025, and it has not been renewed. Ephron is also not a "non-indigent person." The Government therefore recommends that the Court not impose this assessment.

The minor victims have not requested restitution, and so the Government is not requesting any restitution order. The Government requests that the Court enter the attached proposed forfeiture order for the cellphone that Ephron used to commit all five offenses of conviction pursuant to 18 U.S.C. § 2428 and 21 U.S.C. § 853.

F.  **Conclusion**

The Government respectfully requests that the Court impose a sentence of at least 600 months' imprisonment followed by a lifetime term of supervised release and enter the attached proposed forfeiture order.

Respectfully Submitted,

JAY CLAYTON
United States Attorney

by:  __/s/_____
Ryan W. Allison
Lisa Daniels
Andrew Jones
Assistant United States Attorneys
(212) 637-2474 / -2955 / -2249